IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SHOLA ODEYALE<br><br>Plaintiff,<br><br>v.<br><br>ARAMARK MANAGEMENT SERVICES LIMITED PARTNERSHIP,<br><br>Defendant. | Civil Action No.  1:05CV02250 RMC |

**DEFENDANT ARAMARK'S STATEMENT
OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE**

Pursuant to Local Civil Rules 7(h) and 56.1, Defendant ARAMARK Management Services Limited Partnership ("ARAMARK"), submits the following Statement of Material Facts as to Which There is No Genuine Issue ("SMF") in support of its Motion for Summary Judgment:

**ARAMARK Wins The Housekeeping Services Contract For The Washington Convention Center**

1.   ARAMARK Facilities Services[1] ("ARAMARK") is a corporation that contracts to provide a variety of services to convention centers and other facilities, including, *inter alia*, housekeeping and janitorial services.  *See* Complaint ("Compl.") ¶ 3.

2.   Throughout the spring of 2004, ARAMARK participated in the bid process for the housekeeping and janitorial services contract at WCCA.  *See* Excerpts of the Deposition Transcript of Phillip Myers ("Myers Dep.") at 10 attached as Ex. A.

---

[1]   The Complaint improperly named "ARAMARK Facility Services, Inc." as Defendant.  As a result of corporate name changes to various ARAMARK business entities, "ARAMARK Facility Services, Inc." no longer exists.  ARAMARK filed and the Court granted a Consent Motion for Substitution of Defendant to name "ARAMARK Management Services Limited Partnership" as Defendant.

3.  In late July of 2004, ARAMARK learned that it was the successful bidder on the WCCA contract and subsequently entered into a five-year contract to provide janitorial and housekeeping services. Myers Dep. 10, Compl. ¶4. The contract was effective October 1, 2004. Myers Dep. 9.

**ARAMARK Begins Operations At The Convention Center Under The Direction Of District Manager Phillip Myers**

4.  Phillip Myers, an ARAMARK District Manager, participated in the bid process with respect to the Convention Center contract. Myers Dep. 10.

5.  Mr. Myers has been employed with ARAMARK Corporation or its predecessor company for over thirty-one years, primarily in the area of Housekeeping Management. At the time ARAMARK's bid was accepted, Mr. Myers was a District Operations Manager for ARAMARK's Sports and Entertainment Division. In this role, Mr. Myers was responsible for three facilities: McCormack Place Convention Center, Navy Pier, and Greyhound Chicago Maintenance Facility in Chicago, Illinois. Myers Dep. 10-11.

6.  At the time ARAMARK's proposal was accepted at the Convention Center, Mr. Myers relinquished his duties at the other three facilities to focus specifically on the start of ARAMARK business at the Convention Center. Myers Dep. 12.

7.  At the start-up of the contract, Mr. Myers traveled to the DC area and worked at the Convention Center location for approximately two months. Myers Dep. 9. He began at the Convention Center shortly after Labor Day in September of 2004. Myers Dep. 9. The Convention Center's contract with ARAMARK went into effect on October 1, 2004 and Mr. Myers left the Convention Center on or about October 23, 2004. Myers Dep. 9.

8.  Mr. Myers was only on-site at the Convention Center on a short term basis, for the start up of the contract. Myers Dep. 23. It was intended that after several weeks, Mr. Myers

2

would no longer be on site, and the daily business would be handled by Mike Noble, who was hired to be ARAMARK's General Manager at the Convention Center. Myers Dep. 23.

9. Mr. Noble began his employment with ARAMARK during the week of October 1, 2004. Myers Dept. 22. During his first week, Mr. Myers began to get Mr. Noble involved in any decisions that would affect operations going forward. Myers Dep. 23-24.

10. ARAMARK's work force at WCCA included approximately 100 employees. Myers Dep. 14.

11. Other managerial employees were present at the Convention Center to assist with the start-up of the business. Chris Cunningham, an Operations Manager, was also temporarily assigned by ARAMARK to the Convention Center. *See* Excerpts of the Deposition Transcript of Christopher Cunningham ("Cunningham Dep.") at 13 attached as Ex. B. In his role as an Operations Manager, Mr. Cunningham was not permanently assigned to the Convention Center or any other facility, but rather he traveled to various facilities, assisting with special projects. Cunningham Dep. 6, 15.

**Myers Recruits and Hires Shola Odeyale, A Former WCCA Employee**

12. Plaintiff Shola Odeyale, a Nigerian born United States citizen, was employed as a Housekeeping Supervisor by WCCA from April of 2001 to September 30, 2004. *See* Excerpts of the Deposition Transcript of Plaintiff Ololade Shola Odeyale ("Odeyale Dep.") at 33 attached as Ex. C.

13. In early September, Mr. Odeyale was notified by WCCA that his position was being abolished effective September 30, 2004, because WCCA had decided to outsource its housekeeping functions. *See* Abolishment of Position Notice attached as Ex. D; Odeyale Dep. 40.

14. As a result of the WCCA's decision to outsource, Mr. Odeyale was offered and accepted a severance payment of $3899.78. Ex. D; Odeyale Dep. 39. Mr. Odeyale also indicated to WCCA that he wished to continue employment with the Housekeeping Contractor. *Id.*

15. During part of September, Mr. Odeyale had taken a leave of absence from the Convention Center for health problems, during which he had gone to New York to stay with his grandmother. Odeyale Dep. 41.

16. Upon his return to the DC Area, Mr. Odeyale received a telephone call from Mr. Myers regarding employment at ARAMARK. Odeyale Dep. at 41. Mr. Myers told Mr. Odeyale that "he [couldn't] wait to see [Mr. Odeyale]" and that he had heard that Mr. Odeyale was the "best manager." Odeyale Dep. 42-43. Mr. Odeyale responded that he too was excited and told Mr. Myers, "I cannot wait to come over there and join them and join the organization." *Id.* at 43.

17. Mr. Myers requested that Mr. Odeyale come to the Convention Center on September 30, 2004, to apply for a position with ARAMARK. Odeyale Dep. at 44, 54-55.

18. On September 30, 2004, Mr. Odeyale came to ARAMARK's office at the Convention Center and completed an employment application. Odeyale Dep. 54-55.

19. During this initial face-to-face meeting, Mr. Myers again told Mr. Odeyale that people spoke very highly of him, including both housekeepers and management, and welcomed him to ARAMARK. Odeyale Dep. 51.

20. Mr. Myers encouraged Mr. Odeyale to apply for the Daytime Operation Project Manager position - a more senior position. *See* Application for Employment attached as Ex. E; Odeyale Dep. 55. Mr. Myers told Mr. Odeyale that this managerial position would become open once ARAMARK operations were in full swing. Odeyale Dep. 55.

4

21.     Mr. Odeyale was hired by Mr. Myers as a Housekeeping Supervisor. Odeyale Dep. 57. Mr. Myers told Mr. Odeyale that in this position he would be doing what he had done previously during his employment with WCCA. *See* Job Description attached as Ex. F; Odeyale Dep. 58.

22.     Mr. Myers intended for Mr. Odeyale to work in a relief supervisory capacity. Organizational chart attached as Ex. G; Myers Dep. at 15. As a relief supervisor, he would fill in for supervisors who were out on a given day. Myers Dep. at 15. As such, this relief supervisory position might entail different duties each day. *Id.*

**Mr. Odeyale Worked For ARAMARK for Only Four Days**

23.     Mr. Odeyale only worked at ARAMARK for four days. Odeyale Dep. 66. He reported for his first day of work on Friday, October 1, 2004. Odeyale Dep. 50, 62. He then worked Saturday, October 2, and Tuesday, October 5, 2004. Odeyale Dep. 65. His last day of work was Wednesday, October 6, 2004. Odeyale Dep. 65. These are the only days Mr. Odeyale worked for ARAMARK. Odeyale Dep. 66.

**Mr. Odeyale Was Upset About His Initial Work Assignment**

24.     When ARAMARK took over the contract at the Convention Center, WCCA maintained supplies in the warehouses and storerooms. Myers Dep. 16. On the day that the contract began, ARAMARK was able to move and organize WCCA's inventory and replace it with its own. *Id.* The storerooms housed equipment, chemicals, disposable items, paper towels, plastic bags, cleaning supplies, etc. Myers Dep. 17.

25.     During the four days that Mr. Odeyale was employed by ARAMARK, he was assigned to work in the warehouse and storeroom areas. Odeyale Dep. 170. Mr. Myers asked Mr. Odeyale to rearrange some of the supplies in the storeroom. Myers Dep. 29.

26. Mr. Odeyale was tasked with "the logistical set up and getting ready for us to be efficient with our business of setting up that major warehouse…and our store rooms that would be holding supplies or equipment." Myers Dep. 29.

27. Upon receiving this assignment, Mr. Odeyale tried to explain to Mr. Myers that the storage room was already set up as it should be. Odeyale Dep. 68. In fact, under his previous employer, WCCA, Mr. Odeyale had helped to set up the storage room the way it was. Odeyale Dep. 68. As he described it, the storeroom was arranged so employees could access equipment or chemicals in a timely manner. Odeyale Dep. 71. According to Mr. Odeyale, the general consensus was that it was "perfect." Odeyale Dep. 68.

28. Despite Mr. Odeyale's suggestions, Mr. Myers wanted the storeroom to be rearranged. Odeyale Dep. 70-71. Mr. Odeyale again told Mr. Myers that this wasn't a good idea. Odeyale Dep. 71. Nevertheless, Mr. Myers instructed Mr. Odeyale to re-arrange the items in the storage room.

29. Mr. Odeyale did not feel that the way Mr. Myers was directing him to organize the storeroom was appropriate. Odeyale Dep. 92.

30. Although Mr. Myers never told Mr. Odeyale that he would be asked to work in the storeroom on a long-term basis, Mr. Odeyale did not feel that his work during the first week was a supervisor's work. Odeyale Dep. 92, 170. "I'm supposed to be a supervisor, but that's not what I'm doing." *Id.* at 92.

**Mr. Myers Writes A Disciplinary Memo to Mr. Odeyale Following An Incident With Chris Cunningham**

31. On October 6, the last of the four days he worked, Mr. Odeyale was asked to assist Chris Cunningham. Odeyale Dep. 84.

6

32. Mr. Odeyale was showing Mr. Cunningham parts of the facility and they saw an employee, Gerald Willis, "sitting down doing nothing." Odeyale Dep. 84, 86, 88. Mr. Cunningham told Mr. Odeyale to advise Mr. Willis to "go to work." *Id.* at 86.

33. Later in the day, Mr. Cunningham approached Mr. Odeyale again and told him that Mr. Willis was still wasting time. Odeyale Dep. 87. According to Mr. Odeyale, Mr. Cunningham told him to speak to Mr. Willis' direct supervisor, Juanita Jones, and tell her that she needed to "get rid of that guy." Odeyale Dep. 87. Mr. Odeyale communicated this to Ms. Jones. Odeyale Dep. 94, 96.

34. Phil Myers learned about this incident the next day. Myers Dep. 75. Mr. Cunningham told Mr. Myers that he had given Mr. Odeyale a direct instruction to tell the employee to stop wasting time and that Mr. Odeyale had not handled the situation the way that Mr. Cunningham had requested of him. Myers Dep. 75-76. Mr. Myers learned that Mr. Odeyale had told other people that Mr. Willis should be fired, instead of handling the situation himself. Myers Dep. 76.

35. Based on this information, Mr. Myers approached Mr. Odeyale and asked him what had happened. Myers Dep. 77. After learning Mr. Odeyale's side of the story, Mr. Myers testified that he brought Mr. Cunningham into the meeting. After Mr. Cunningham explained what he had said, Mr. Odeyale admitted that what he had previously told Mr. Myers about the incident may not have been true. Myers Dep. 80-81.

36. Mr. Myers counseled Mr. Odeyale that this was not the way that ARAMARK supervised its employees and prepared a memorandum documenting the discussion. *See* Memorandum from Phil Myers to Shola Odeyale dated October 6, 2004 attached as Ex. H; Myers Dep. 84.

7

37.     Mr. Odeyale has no recollection of ever discussing the Gerald Willis incident with Mr. Myers. Odeyale Dep. 95.

### Mr. Odeyale Was Disciplined For Unauthorized Use of the Forklift

38.     At the start up of the contract, WCCA emphasized to ARAMARK management that WCCA's policies should govern the operation of equipment, including forklifts, in the facility. Myers Dep. 56-57. Specifically, ARAMARK employees needed to be trained and certified to operate equipment and WCCA would manage that certification process. Myers Dep. 57. WCCA administration communicated this to Mr. Myers before the contract started in October. Myers Dep. at 56-57.

39.     Diane Nelson, a WCCA manager, was to provide whatever training and education was needed on equipment. Myers Dep. 57.

40.     On October 6, Mr. Odeyale told Mr. Myers that he wanted to use the forklift. Odeyale Dep. 118. Mr. Odeyale communicated that he had used the forklifts in the past. Myers Dep. 59.

41.     Later in the day, Mr. Myers was informed by Ms. Nelson that Mr. Odeyale had not completed the requisite testing or certification process. Myers Dep. 58, 59-60.

42.     Mr. Myers, along with Diane Nelson, approached Mr. Odeyale and told him to stop driving the forklift. Myers Dep. 61; Odeyale Dep. 120. Mr. Myers asked Mr. Odeyale why he didn't tell him that he wasn't permitted to use the forklift. Odeyale Dep. 121.

43.     Mr. Myers was very angry, and Mr. Odeyale testified that he looked like he was going to strike him. Odeyale Dep. 122.

44.     Ms. Nelson also reiterated Mr. Myers' position to Mr. Odeyale, saying, "Shola, you (sic) supposed to be certified to be operating the forklift." Odeyale Dep. 124.

45. Mr. Odeyale admits that he was not certified to drive the forklift. Odeyale Dep. 124.

46. As a result of this incident, Mr. Myers asked Mr. Odeyale to return the forklift key and prepared a written disciplinary warning for Plaintiff. *See* Memorandum from Phil Myers to Shola Odeyale dated October 6, 2004 attached as Ex. I; Odeyale Dep. 124; Myers Dep. 62.

**Mr. Odeyale Alleges That Mr. Myers "Tortured" Him In the Storeroom**

47. Plaintiff's Complaint alleges a single incident where Mr. Myers allegedly became physical and used a racially derogatory name with the Plaintiff. Specifically, the Complaint alleges the following:

> On/about October 5, 2004 when Plaintiff addressed his supervisor with his concerns regarding his job assignment, Defendant ARAMARK's supervisor, Phil Myers, grabbed Plaintiff by his clothing, putting Plaintiff in fear of imminent physical harm, pushed Plaintiff causing him to injury his head (sic) and called Plaintiff a racially derogatory name.

Compl. ¶12.

48. At his deposition, Mr. Odeyale testified that this incident occurred the same day that Mr. Odeyale was disciplined for using the forklift, October 6, 2004. Odeyale Dep. 130-131.

49. He further testified that he was standing on a ladder in the storeroom when Mr. Myers approached him, raised his voice to Mr. Odeyale, began calling him names, and grabbed his pants and pulled him and the ladder over on to the ground. Odeyale Dep. 132-133. Odeyale Dep. 132. Mr. Odeyale alleges that when he was pulled off the ladder, he suffered injuries to his head and back. Odeyale Dep. 136.

50. There are no other allegations in Plaintiff's Complaint about racial hostility or harassment. *See generally* Compl.

9

51. At his deposition, Mr. Odeyale broadened and elaborated on the nature of his claims. He testified that Mr. Myers called him names, including the N word, "frequently." Odeyale Dep. 141. Mr. Odeyale alleges that he was confined to the storage room, moving heavy objects, when he was supposed to be supervising employees. Odeyale Dep. 93. According to Odeyale, Mr. Myers, the district manager, spent the majority of his day in the storeroom with Mr. Odeyale, drinking coffee. Odeyale Dep. 81.

52. During his testimony, Mr. Odeyale also described the following incidents or allegations regarding his employment at ARAMARK:

- On two occasions, Odeyale alleges that Myers did not permit him to take breaks to take his diabetes medication. Odeyale Dep. 174, 177-178. According to Mr. Odeyale,

    > [H]e did not let me take my 15 minutes break, he did not let me take nothing, but I need to take my medicine. I just came back. You know I just came back from my sick leave. Please. I'm begging him. I beg you, Phil, please don't kill me. Let me go and take medicine. He said medicine? I show it to him. I wrap it in the paper towel. I show it to him. I have to take this. He said no no no. You listen to me. N word. Go and do your job. Go and do this. I don't care. And I was sweating. He say I don't care.

Odeyale Dep. 174.

- Odeyale alleges that Myers called him names, including "nigger," "sickler," "African Chicken," and "asshole." Odeyale Dep. 178, 181, 259. Mr. Odeyale describes Mr. Myers:

    > "telling me to be looking at the letter N on the boxes. So he told me to be looking at those letter and tell him what the N stand for. . . . And Phil Myers told me no, you didn't get it. You didn't get the popular one in America, dummy. He is referring to me. He said, you dummy, you don't know what the N stand for. You telling me you live in America for a long time. You don't know what the letter N stand for. Letter N stand for nigger, man. Nigger. It's nigger. So the way to pronounce it. He said what did I saw. I said

10

> you say N. So he say no, I want you to say it. Then I was crying.
> I said no, I'm not going to say it. Then I was crying. I said this is
> tortured. You are torturing me."

Odeyale Dep. 181.

- Odeyale alleges Myers made comments about Mr. Odeyale's passport and called him a "dummy." Odeyale Dep. 182. He testified:

> Phil Myers was looking at my U.S., my passport, and he said, who
> gave you the passport? And I said, President Bush. He said you
> dummy. President Bush is a dummy too. Whoever give you the
> passport, everybody is a dummy. They give you citizenship and
> just, just anyhow. He said he can't believe that people like you
> will give you a citizenship. Whoever give you is a dummy. You
> too, you a dummy.

Odeyale Dep. at 182.

- Odeyale alleges Myers made fun of his Democratic affiliation and crumpled his voter registration card. Odeyale Dep. 184. According to Mr. Odeyale, "I say I am a registered Democrat. And he says you? I said yes, I'm a registered Democrat. And I show him my voter registration card in my pocket…And he rip it – he squeeze it and he threw it at me." Odeyale Dep. 184.

53.    In support of his allegation that he was called the N-word, Plaintiff submitted the Declaration of Selita Janey, a security guard for WCCA stating that she "heard Mr. Myers call Mr. Odeyale a "nigger" in a loud voice." At her deposition, however, Ms. Janey testified that the declaration was not true and correct and that she wished to withdraw it. *See* Excerpts of the Deposition Transcript of Salita Janey ("Janey Dep.") at 23, 44-45, 58 attached as Ex. J.

54.    Mr. Odeyale has no recollection of how many times, or on which days Mr. Myers called him the N-word, but testified that it occurred "frequently." Odeyale Dep. 141, 260.

**Mr. Odeyale Alleges that Mike Noble, General Manager, Terminated His Employment**

55. Mr. Odeyale alleges that he went to the General Manager, Mr. Noble, on October 7, to report the events of October 6. Odeyale Dep. 128. Mr. Odeyale claims that he explained how Mr. Myers had pulled him off the ladder, that he would not let him take his medication, and that he was forcing him to move heavy items without any help. Odeyale Dep. 129. Mr. Odeyale further claims that he explained that Mr. Myers called him a sickler, the N-word, and a chicken. Odeyale Dep. 130.

56. According to Mr. Odeyale, in response to his complaints, Mr. Myers told him "Phil Myers don't like you, he cannot work with you, so you're terminated." Odeyale Dep. 130.

57. Mr. Noble told Mr. Odeyale that his paycheck would be ready on October 22. Odeyale Dep. 151.

58. Mr. Odeyale doesn't know whether Mr. Noble terminated his employment because of his race. Odeyale Dep. 179-180. Mr. Odeyale never heard Mr. Noble use racially derogatory language. Odeyale Dep. 159-160.

59. Following this conversation, Mr. Odeyale claims that he attempted to report his termination to WCCA's Human Resources office. Odeyale Dep. 147. He contends that he wanted to report the termination to Ms. Benkins, Director of Administration, because he felt that pursuant to Convention Center's letter, ARAMARK was obligated to employ him for a period of six months. Odeyale Dep. at 148; Ex. D. He further alleges that he was unable to see Ms.

Benkins that day and so he left. Odeyale Dep. at 149-150. Mr. Odeyale has no recollection of whether he reported the incident to anyone else in WCCA Human Resources. *Id.*

                                                       Respectfully submitted:

                                                       /s Katherine J. Emig
                                                 Grace E. Speights (D.C. Bar No. 392091)
                                                 Katherine J. Emig (D.C. Bar No. 496410)
                                                 MORGAN, LEWIS & BOCKIUS LLP
                                                 1111 Pennsylvania Avenue, N.W.
                                                 Washington, DC  20004
                                                 Phone:  (202) 739-3000
                                                 Fax:  (202) 739-3001

                                                 *Counsel for Defendant*
                                                 *ARAMARK Management Services Limited Partnership*

Dated:  March 8, 2007

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I filed electronically and served via U.S mail postage prepaid, a copy of the foregoing Defendant ARAMARK's Statement of Material Facts As To Which There Is No Genuine Issue, this 8th day of March 2007, upon counsel for Plaintiff:

>Michael J. Hoare, Esq.
>Michael J. Hoare, P.C.
>1101 14th Street, N.W., Suite 710
>Washington DC 20005

>>/s/ Katherine J. Emig
>>Katherine J. Emig