# EXHIBIT A

# Excerpts of the Deposition Transcript of Phillip Myers

```
           UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF COLUMBIA
```

SHOLA ODEYALE,

    Plaintiff,

  v.                         Civil Action

ARAMARK MANAGEMENT SERVICES   No. 1:05cv02250RMC

LIMITED PARTNERSHIP,

    Defendant.

---

DEPOSITION OF PHILLIP MYERS

November 29, 2006

Richmond, Virginia

HALASZ REPORTING & VIDEO

P. O. Box 1644
Richmond, VA 23218-1644
(804) 741-5215

Reported by: Cynthia G. Shortlidge, RPR

a                                C&I Basic™

1   You were assigned there for a period of time?
2   A   Yes.
3   Q   How long were you there?
4   A   At the Washington Convention Center from the day
5 after Labor Day of 2004 I believe, whatever that day was, to
6 start the business. Our contract went into effect October
7 first of 2004 and the day I left the D.C. Convention Center
8 was near the last Friday of October, which was on October
9 22nd, 23rd. I don't have a calendar. So I was there just
10 about two months, not quite two months.
11   Q   Who assigned you there?
12   A   Aramark.
13   Q   Who at Aramark?
14   A   The people that I reported to. My direct report
15 at that time would have been Bill Bedrosian,
16 B-e-d-r-o-s-i-a-n. I reported to Bill in what's called our
17 sports and entertainment division. I worked for sports and
18 entertainment division from I would say it was from July of
19 2002 until January first of 2005, which included convention
20 centers.
21   Q   Was it Mr. Bedrosian who referred you or
22 directed you to the Washington Convention Center?
23   A   In the process, my reporting relationship with
24 him changed on or about July of that year, and my
25 vice-president became from July until the time I left the

1 convention center on October 23rd would have been Brian
2 Cuanne. He was the vice-president of operations.
3   Q   All right, and who directed you to the
4 Washington facility?
5   A   I would suggest Brian Cuanne.
6   Q   Did he tell you why?
7   A   Yes.
8   Q   And what did he tell you?
9   A   I was involved with the survey process of the
10 D.C. Convention Center in the late spring of 2004, so I was
11 a part of the sales process through the course of that
12 summer when we were told we were the successful bidder on or
13 about July of that year it was going to become part of my
14 district.
15   Q   And what does that mean, that it became part of
16 your district?
17   A   In August of 2002 I was promoted to district
18 operations manager, which included the McCormack Place
19 Convention Center in Chicago, Navy Pier, which is in
20 Chicago, Illinois, as well as Greyhound Chicago Maintenance
21 Facility was my district prior to this sale. My district
22 was being expanded to include the direct responsibility of
23 the Washington Convention Center.
24   Q   So how many different facilities is that?
25   A   D.C. Convention Center would have been four.

1   Q   So there's D.C. and then there's the Greyhound?
2   A   Yes.
3   Q   What kind of facility is that?
4   A   That's a maintenance depot or large garage in
5 Chicago where all the busses come through.
6   Q   And there was a pier?
7   A   Navy Pier.
8   Q   Navy Pier in Chicago?
9   A   That's correct.
10   Q   And what's the nature of that facility?
11   A   Tourism.
12   Q   And --
13   A   The McCormack Place.
14   Q   McCormack Place is what, please?
15   A   The largest convention center in the world.
16   Q   Also in Chicago?
17   A   In Chicago, that's correct.
18   Q   And you had responsibilities for those four
19 facilities at that time?
20   A   Yes.
21   Q   Okay, and that was at least during October of
22 2004?
23   A   September and October, yes. I was physically on
24 site at the Convention Center non-stop from the day after
25 Labor Day until I exited.

1   Q   Explain to me how you were able to maintain your
2 duties and responsibilities with respect to the other three
3 facilities while on site at the Washington facility.
4   A   When I went to the D.C. Convention Center I was
5 relieved of those duties at the other three locations. They
6 were reorganizing our company and my focus was specifically
7 the start-up of our business at the Washington Convention
8 Center. That was my only role during that period.
9   Q   After October of 2004 did you have any further
10 responsibility for the Greyhound facility?
11   A   No.
12   Q   Or for the Navy Pier facility?
13   A   No, that ceased.
14   Q   Or for McCormack Place?
15   A   That ceased the day after Labor Day.
16   Q   Is the same true with respect to the McCormack
17 Place facility?
18   A   Yes, that's correct.
19   Q   Are you a smoker, sir?
20   A   Yes.
21   Q   Were you smoking in October of 2004?
22   A   Yes.
23   Q   Now, what was the nature of the contract you had
24 pertaining to the Washington Convention Center as of October
25 of 2004? What was your principal duty and responsibility?

Page 9 - Page 12

a                                C&I Basic™

1   A   I was district manager of that location.
2   Q   And were you supervising people?
3   A   Yes.
4   Q   What were your duties and responsibilities?
5   A   As outlined in our contract when we began on
6 October 1st would be all the cleaning of that facility and
7 sidewalks and grounds.
8   Q   Interior and exterior?
9   A   Yes.
10  Q   Were there other persons responsible also for
11 cleaning the facility?
12  A   Labor work force and our leadership team.
13  Q   Labor work force and the --
14  A   Leadership team, which would be supervisors and
15 managers.
16  Q   I see, okay.
17      And the labor work force would have an in-house
18 labor work force?
19  A   There were, I can't recall the quantity of
20 employees that worked directly for the Convention Center,
21 but there was a group of grandfathered employees that
22 supported our business in the office locations there, but
23 everyone else was placed on Aramark payroll effective
24 October 1st.
25  Q   Some people responsible for cleaning the

1 Convention Center were on the Convention Center payroll?
2   A   On October first?
3   Q   Yes.
4   A   Yes, there was a small amount. It was greater
5 than ten but less than 15.
6   Q   And what was the size of your work force, ball
7 park?
8   A   One hundred people.
9   Q   Okay.
10  A   Temporary people would come and go depending on
11 the shows. So there were some full-time permanents, but
12 most of the staff would come and go as the work would
13 require.
14  Q   So were you responsible for set-up as well as
15 housekeeping?
16  A   Yes, I was totally accountable for that startup
17 business until I exited.
18  Q   Were you -- I'm using setup in the context of
19 what I believe is the term used to describe the work force
20 within the Convention Center that actually puts up the walls
21 and helps set the tables and all that.
22  A   No, no, we would not have the responsibility of
23 the exhibit halls, if that's your question.
24  Q   You would not have the responsibility?
25  A   Of the exhibit hall.

1   Q   Okay, except to clean them?
2   A   After, post the show..
3   Q   All right, Mr. Odeyale, do you recall him from
4 your stint in Washington, D.C.?
5   A   Yes.
6   Q   Okay. What area of the Convention Center so far
7 as you were concerned was he working?
8   A   I don't believe he had a geographic area.
9   Q   Was there a particular area in which he worked?
10  A   During the time of my interaction, which was one
11 week, he was in a relief supervisory capacity. That's what
12 he was recruited to be by me. And he would be a
13 supervisor, the role he was going to become if a supervisor
14 was off he would fill in to do whatever their specific roles
15 may have been that particular off day, which meant different
16 shifts potentially and different duties each and every day.
17  Q   All right. And did you anticipate that Mr.
18 Odeyale would be relieving supervisory personnel who were
19 directly responsible for housekeepers?
20  A   Yes.
21  Q   Did that ever happen?
22  A   Not during the course of the first week of the
23 startup.
24  Q   Did he work during the course of the first week?
25  A   Yes.

1   Q   Where did he work?
2   A   At first he worked with general setup of our
3 startup which were the supply lines, meaning our store room
4 spaces where we had equipment and supplies. As I recall
5 that was the primary focus during the course of that first
6 week or four or five days that he worked on site.
7   Q   What do you mean by general setup in that
8 context?
9   A   When we started the business the client, meaning
10 the Convention Center, had supplies that were in these
11 warehouses and store rooms. The day that we took the
12 business contract we were able to move and organize their
13 inventory and either A, replace it with our organization in
14 such a means that would be functional to us to assist the
15 operation logistically.
16  Q   And then where was that inventory stored?
17  A   Most likely it was in the same room. I don't
18 know if items truly left there and were disbursed to
19 different store rooms. I think there was some of that.
20  Q   What was that room called?
21  A   The warehouse. There were other supply rooms.
22 I can't remember any names or numbers. We had one large
23 area and multiple smaller areas.
24  Q   And the large area was called the warehouse?
25  A   That's my name. I can't tell you the name of

a                                  C&I Basic™

| | |
|---|---|
| 1 that.<br>2   Q  And the smaller areas were called?<br>3   A  Housekeeping store rooms.<br>4   Q  What did you store in those rooms, the smaller<br>5 ones?<br>6   A  Equipment, chemicals, disposable items, paper<br>7 towels, plastic bags. What I mean by disposable, cleaning<br>8 supplies, anything doing with the housekeeping function.<br>9   Q  All right, and did you store different things in<br>10 the larger area?<br>11  A  Maybe larger volume of the same types of items.<br>12 I believe part of that warehouse could have had items that<br>13 belonged to the Convention Center. It was not just our<br>14 warehouse, so as I remember there were Convention Center<br>15 items, goods that they had or whatever. They were not<br>16 related to our business.<br>17  Q  You indicated that Mr. Odeyale was there for a<br>18 week. Is that correct?<br>19  A  That's correct.<br>20  Q  Is that a seven day week?<br>21  A  To my recollection his first start day with<br>22 Aramark would have been a Friday, October 1st, and he<br>23 resigned his position verbally to myself on or about the 6th<br>24 or 7th, 8th of October, whatever that Thursday, Friday was<br>25 the following week. | 1   Q  Temporary housekeeping office?<br>2   A  Yes.<br>3   Q  What time of the day did the conversation take<br>4 place?<br>5   A  I can't recollect if it was in the morning --<br>6   Q  You can't tell me whether it was in the morning<br>7 or in the afternoon?<br>8   A  No, sir, this has been over two years ago.<br>9   Q  Was anyone else present?<br>10  A  Yes.<br>11  Q  Who?<br>12  A  Mike Noble.<br>13  Q  Mr. Noble's title was?<br>14  A  General manager of our housekeeping department.<br>15  Q  How long did the meeting last?<br>16  A  I can't recollect. It was not very lengthy.<br>17 Maybe ten minutes, maybe.<br>18  Q  Who initiated the meeting?<br>19  A  I recollect that we spoke on the phone. I can't<br>20 recall. I would have to -- again, some of the documents<br>21 that we dealt with I don't know if I talked to him the<br>22 previous day or if we spoke that morning. I can't recall.<br>23  Q  You don't remember how the meeting started?<br>24  A  The meeting basically started when Shola showed<br>25 up. I don't know if we had a preset time or it was a |
| 1   Q  Was it on Thursday or Friday?<br>2   A  I'd have to look at the document, sir. I can't<br>3 remember the actual day that he had told me he was quitting<br>4 and no longer wanted the job.<br>5   Q  What documents would you look at?<br>6   A  There were some documents that were issues were<br>7 arising, some timelines that were issued from myself to<br>8 help. I can't recall the three or four that were<br>9 performance issues were happening that I would have to look<br>10 at to see what day he actually told me he resigned or quit.<br>11  Q  Is there a document that indicates that he told<br>12 you that he resigned or quit?<br>13  A  One of those would be reflective of my last<br>14 conversation with him, yes.<br>15  Q  Okay. What was the nature of the last<br>16 conversation you had with him?<br>17  A  Primarily we were dealing with some issues that<br>18 had happened the previous day or so. We had some<br>19 performance issues and the nature of the conversation played<br>20 out very quickly. The meeting did not last long as I<br>21 remember where he said he quit. He said I resign, I no<br>22 longer want to work here and walked out of the office.<br>23  Q  Where did that conversation take place?<br>24  A  In the temporary housekeeping office located<br>25 next to the warehouse I've been referring to. | 1 walk-in event or I had some documents to review. And as we<br>2 started to talk about the documents we did not complete that<br>3 conversation when as I recall he just basically informed me<br>4 of his resigning the position and quitting.<br>5   Q  Which documents did you have?<br>6   A  I had some documents that were the performance<br>7 issues that had been taking place during the course of the<br>8 last two business days.<br>9   Q  Did you show him these documents?<br>10  A  I believe so.<br>11  Q  So you had documents, you showed them to him?<br>12  A  Yes.<br>13  Q  Did you discuss them with him?<br>14  A  Yes, I believe we did. I mean we went to a<br>15 certain point when the meeting was ceasing and in his<br>16 frustration threw his hands up and informed me that he was<br>17 quitting his employment with Aramark.<br>18  Q  So when you say I believe he did, you mean by<br>19 that that you don't know whether or not he did?<br>20  A  I know I was in the process of completing<br>21 whatever documents I had, and either we went completely<br>22 through those or we were near the end, we had covered what<br>23 the issues were and to me it appeared that either the<br>24 meeting, again this is over two and a half years ago, so as<br>25 the meeting concluded either I completed that, reviewed |

a    C&I Basic™

1 these documents and then he informed me he quit or we were
2 through the process near the end of these documents when he
3 had heard enough, one of the two. But it was an
4 abrupt decision that he reported to me that he was
5 resigning.
6   Q   All right. Have you reviewed those documents?
7   A   Recently?
8   Q   Yes.
9   A   Yes.
10  Q   In anticipation of this deposition?
11  A   That's right. Katherine had notified me and I
12 had been away from these things.
13  Q   When did you review them?
14  A   This morning.
15  Q   All right, do you remember anything that Mr.
16 Odeyale said to you?
17      MS. EMIG: At what time?
18      MR. HOARE: During that meeting.
19  Q   Let me rephrase the question because I didn't
20 want to confuse you.
21      We're still talking about this meeting that
22 you're describing that you had with Mr. Odeyale on Thursday
23 or Friday of the last work week that he was at the
24 Convention Center. And my question to you is: Do you
25 remember anything that he said to you?

1   A   I remember distinctly his resigning and
2 quitting. That I can recall.
3   Q   Can you recall anything else?
4   A   No, sir, I cannot. And as we went through the
5 documents I don't know if there was any exchange or any
6 reaction or response from him. I can't recall.
7   Q   Okay.
8       Other than what Mr. Odeyale said to you which
9 you cannot recall, do you recall what you said to Mr.
10 Odeyale?
11  A   The only things I would have had conversations
12 about is the content of those memorandums from me.
13  Q   Do you recall what you said to him?
14  A   I would have more read the items. If I had
15 those I'm sure we covered it and I would have mostly, again,
16 reviewed the content of what it was saying. Did we veer off
17 of that? I can't recall.
18  Q   Okay. Did Mr. Noble have any contribution in
19 this conversation?
20  A   None whatsoever.
21  Q   What was he doing there?
22  A   He was starting that week as the general manager
23 so he was new on site, and during the course of that
24 particular week Mike's responsibilities were to be a client
25 and understanding the management, so Mike's focus was

1 directly that of understanding the Convention Center
2 specifically away from the day-to-day startup operations
3 which I was managing. So Mike was primarily there as a
4 witness and being the general manager that would go on in
5 the future.
6   Q   In what context do you use the term witness?
7   A   Being present. Number one I think could have
8 the first time, and I don't recall that he met Shola during
9 the course of the week. I don't know how much, if any,
10 interaction they had previous to that day. But it was
11 imperative because my stint of starting up the business was
12 going to be short, being defined in weeks, if you will, that
13 Mike was going to be resident general manager of this
14 business on a daily basis.
15  Q   Did you use the term witness in the context that
16 you wanted him available to observe what happened between
17 you and Mr. Odeyale?
18  A   No, sir, just mostly being present because he
19 was going to be the general manager, he would be in complete
20 charge of this facility in my absence.
21  Q   And in that context what value would it have
22 been for him to observe your interaction with Mr. Odeyale on
23 that particular occasion?
24  A   Well, I think the items that we were referring
25 to were performance issues that needed to be at Mike's

1 attention. Mike's role was to be there daily in his job.
2 He would be accountable for the day-to-day operations. I
3 felt that Mike needed to, number one, either meet Shola for
4 the first time, second, be aware of the events that have
5 been transpiring over the course of the last couple of days,
6 which I'm not certain, but most likely the day or two before
7 I would have tried to keep Mike staffed if there was
8 something significant going on I would have shared it.
9       So Mike was going to be the general manager of
10 this location when I was to exit, so he needed to be
11 involved with decisions that were going to affect him in the
12 future and to potentially meet Shola for the first time.
13  Q   Did you introduce Mike Noble to other employees?
14  A   During the course of that first week?
15  Q   Yes.
16  A   At times, sure.
17  Q   Did you take him around and introduce him to the
18 hundred employees who were working there?
19  A   Not necessarily the hundred. I think Mike would
20 be present on clock-in times when all the employees would be
21 reporting. I recall him being at the table and observing
22 multiple times during the first few days of his employment
23 with Aramark he would meet people, yes, I would introduce
24 him to people. He potentially could have met Shola through
25 the course of that week. I can't remember. There was

a                                C&I Basic™

1 people on the management team during the course of the first
2 couple of weeks? Yes. I understood the big picture of what
3 we needed to obtain the first week, knowing what we needed
4 to do for the second week and so on.
5         So I'm trying to answer your question. I
6 understood clearly what Shola would be doing during that
7 course of the first week. I was in tune with that because
8 again, I was the conductor, if you will, of what was going
9 on. But he would have had other interactions with other
10 managers or supervisors.
11    Q   What did you understand he was to do that week?
12    A   That particular week was our set-up week or our
13 start-up, if you will. We needed the -- the roles he was
14 involved in directly I believe would have been the
15 logistical set-up and getting ready for us to be efficient
16 with our business of setting up that major warehouse I'm
17 referring to and our store rooms that would be holding
18 supplies or equipment, that I'm fairly clear on. He may
19 have had other responsibilities that varied beyond that, but
20 I can't recall.
21    Q   Well, what you can recall is that he was
22 assigned logistical set-up duties?
23    A   Yes.
24    Q   In the warehouse and stockroom?
25    A   He was to assist in that process, correct.

1     Q   Who was responsible for that process?
2     A   The person actually present to orchestrate that
3 role would have been a gentleman by the name of Chris
4 Cunningham.
5     Q   What was his title?
6     A   I would refer to Chris as project engineer.
7     Q   Can you define what that means in your world?
8     A   My best definition he was sent to me by the
9 company of Aramark to assist me with logistical issues or
10 whatever we needed to address at the moment. It could have
11 been an sundry of duties that I could have assigned Chris
12 to, but specifically for the week previous to the start-up
13 and the first week after and maybe it went on a little
14 further, was the equipment and supply lines to get our
15 products officially distributed to people that needed to use
16 those. That was Chris' major focus for me during those
17 first couple of weeks or the preceding week, I can't
18 remember. It all links together of us getting ready. We
19 worked but we didn't physically start to set these up until
20 we were really starting.
21    Q   If you could explain to me how Chris
22 Cunningham's duties and responsibilities during that first
23 week would differ from Mr. Odeyale's duties and
24 responsibilities.
25    A   Chris reported directly to me. I can tell you

1 that Chris had the experience of starting the new business,
2 so he was experienced in the duties of these logistics we've
3 been referring to because he's performed that in other
4 locations for the company. I don't know how long Chris was
5 with Aramark, but he was familiar with our product lines and
6 our equipment. So he was in charge, if you will, based on
7 our discovery during the weeks preceding how we were going
8 to logistically set things up. I made some decisions of
9 what my vision was and Chris had the autonomy to look at the
10 situation and suggest it and we would agree or disagree.
11    Q   But you would make the decision?
12    A   Potentially, unless it was a small one.
13        If I had to go to the client I went to the
14 client instead of Chris.
15    Q   The client meaning the Convention Center?
16    A   The Convention Center.
17    Q   So was Chris in the position to supervise
18 Mr. Odeyale?
19    A   Yes.
20    Q   Okay.
21    A   He was to oversee it, yes.
22    Q   Chris was in the position to tell Mr. Odeyale
23 what to do?
24    A   Yes, sir.
25    Q   Did Mr. Odeyale report to Chris?

1     A   I would suggest, yes.
2     Q   Okay, and he reported as well to you?
3     A   Not necessarily as a direct report relationship,
4 no. When Chris needed to get something established, Mr.
5 Odeyale was assigned to Chris to help make those things
6 happen from a start-up perspective.
7     Q   All right, on a day-to-day basis during that
8 first week?
9     A   Yes.
10    Q   We're not talking about a whole lot of days,
11 were you or Chris Cunningham Mr. Odeyale's principal
12 supervisor?
13        MS. EMIG:  Objection to form. Go ahead.
14    A   No, I would suggest Chris.
15    Q   Chris you said?
16    A   Uh-huh, he knew what we needed to accomplish and
17 what our desires were.
18    Q   Okay. So it was Chris you say was his principal
19 supervisor?
20        MS. EMIG:  Objection to form again.
21    A   I don't know what that means.
22    Q   You may answer.
23        MS. EMIG:  If you can answer. To the extent you
24 understood the question you can answer that.
25    A   Chris was accomplishing the tasks and logistics

a                                    C&I Basic™

| | |
|---|---|
| 1 any problems with his overall attitude?<br>2     A  Nothing jumps out. When you say attitude, it's<br>3 very large. We didn't have any confrontations, if you will.<br>4 I can't recollect something standing out in my mind.<br>5 I mean I can recall performance issues.<br>6     Q  You have had difficulties with other employees<br>7 over the course of the years that you have been a supervisor<br>8 where they have demonstrated just the wrong attitude?<br>9     A  A negative --<br>10        MS. EMIG: Objection to form.<br>11    A  A negative behavior, that's what you're saying?<br>12    Q  Yes.<br>13    A  Yes.<br>14    Q  And if not behavior, just poor attitude. Do you<br>15 recognize that as a possible deficiency in an employee?<br>16    A  If I interact with them and I sense that that's<br>17 the case, yes, I'll identify if somebody's not saying or<br>18 body language or some reason they don't want to conform to<br>19 what I may describe as normal I guess is how I would answer<br>20 that.<br>21    Q  Okay. You have had other employees with<br>22 attitude problems?<br>23    A  Problems, yes.<br>24    Q  Yes?<br>25    A  Yes. | 1 Because I could recall specifically on this forklift issue<br>2 where I had direct interaction that what I said clearly in a<br>3 previous time, be it that day or the day before, was totally<br>4 ignored by Mr. Odeyale.<br>5     Q  Okay. And other than that you didn't observe<br>6 any attitude problem with Mr. Odeyale?<br>7     A  Not that I can recall.<br>8     Q  Okay. And was he essentially respectful towards<br>9 you?<br>10    A  I would suggest yes.<br>11    Q  Did you have any difficulty with his personality<br>12 in any regards?<br>13    A  No, sir.<br>14    Q  I want to go back to this attitude problem that<br>15 you --<br>16        MS. EMIG: Objection, I'm not sure, that might<br>17 mischaracterize his testimony.<br>18        MR. HOARE: Well, it is what it is.<br>19    Q  You told him that you didn't want him to use the<br>20 forklift?<br>21    A  Yes.<br>22    Q  And later you found out that he used the<br>23 forklift?<br>24    A  I observed it because I heard it start up and he<br>25 was driving it. |
| 1     Q  Did you observe any attitude problem of Mr.<br>2 Odeyale?<br>3     A  Not listening well would be part of an attitude<br>4 where I thought I was very clear and concise with<br>5 instruction that was failed to be followed. So if you call<br>6 that a non-conforming attitude I would suggest that would be<br>7 one of my answers to that question.<br>8     Q  Anything else other than not listening well?<br>9     A  Not listening well and following through, it's a<br>10 connection to it, clear instructions given and then it's not<br>11 followed through on or something completely contrary to what<br>12 you've requested somebody to do and they failed to do that.<br>13 And they may have done what they wanted to do anyhow. I<br>14 would suggest that would fit.<br>15    Q  Is that an attitude problem or a problem with<br>16 insubordination?<br>17    A  I can't answer that.<br>18    Q  Did you discern with Mr. Odeyale an attitude<br>19 problem?<br>20        MS. EMIG: Objection to form.<br>21        You can answer that if you understand the<br>22 question.<br>23    A  Again, in the context of attitude of not<br>24 following through on instructions, if that's fitting your<br>25 context of having a negative or performance issue, yes. | 1     Q  And when you told him you didn't want him to use<br>2 the forklift, did you observe on that occasion any problem<br>3 with his attitude?<br>4     A  No, I thought he fully understood my request.<br>5     Q  He was attentive to you and respectful to you?<br>6     A  Yes, sir.<br>7     Q  And then you saw him later on the forklift<br>8 operating it?<br>9     A  Yes.<br>10    Q  And from that you inferred a bad attitude?<br>11        MS. EMIG: Objection to form.<br>12    A  In the context I connected this situation to the<br>13 definition of attitude, yes.<br>14    Q  You were unhappy with him?<br>15    A  Very displeased.<br>16    Q  You were upset with him?<br>17    A  I was upset.<br>18    Q  Okay.<br>19        Let's talk about the forklift for an instant.<br>20    A  Okay.<br>21    Q  What was your concern about Mr. Odeyale using<br>22 the forklift?<br>23    A  The client here, meaning the Convention Center,<br>24 was very clear before we ever started the business that the<br>25 equipment being operated in that facility, to conform with |

Page 53 - Page 56

a                                            C&I Basic™

1 their policies the people needed to be trained and or
2 certified or tested, and they as a client would provide many
3 forms of that certification, if you will, prior to people
4 just getting on equipment and possibly creating damage
5 situations which they have experienced. This is what I
6 recall from the client setting the tone on the equipment,
7 damages that had taken place, injuries that may have existed
8 before and safety factors of people that are on items that
9 aren't properly trained and educated. So they went out of
10 their way well before October first to communicate directly
11 to me that demand. It was not a request.
12    Q  And who gave you that demand?
13    A  The administration there, it could have been
14 Rick who was the previous --
15    Q  Do you remember who it was?
16    A  No, it was administration in general. And I was
17 told training needed to be provided, they had an individual
18 on site named Dianne and Dianne would, I can't tell you her
19 last name, would provide whatever training and education
20 people needed on sensitive pieces of equipment.
21    Q  Were there forms or paperwork to be completed in
22 connection with any training that was to be provided with
23 respect to the forklift?
24    A  Yes, I was told that. I didn't observe it or
25 see it. I didn't keep those records. It was just made

1 representative under him, they made that an expectation of
2 ours as Aramark to be safe in the organization.
3    Q  You can't identify for me today any of the
4 people who --
5    A  No, sir.
6    Q  -- gave you that information?
7    A  It could have been Rick.
8    Q  I'm not asking you to guess.
9    A  I have no clue.
10   Q  Okay.
11   A  I couldn't be sure.
12   Q  Thank you.
13      Do you know what training, testing or
14 certification Mr. Odeyale had with respect to the forklift?
15   A  No, sir.
16   Q  Do you know what experience he had with respect
17 to the forklift?
18   A  No, other than I think some of our dialogue
19 there was that he felt he was capable of operating it and
20 had in the past. I want to think that conversation took
21 place the day of the incident.
22   Q  Did you ever see Mr. Odeyale on the forklift?
23   A  Yes, sir.
24   Q  What was he doing with the forklift?
25   A  Driving it and lifting the heavy pallets in that

1 clear to me.
2    Q  All right. Do you know of any forms or
3 paperwork to be provided regarding any testing that was to
4 take place?
5    A  I was told by the client on this particular day
6 of the instance that the tests or certifications never
7 existed with Shola, that it was not conducted. I was
8 verbally told by the individual named Dianne that people,
9 again before we started it, that they made it clear and she
10 underscored and she was pretty adamant about it and said no
11 one operates this stuff until you check with me and so on to
12 operate this equipment. That was one of maybe multiple
13 pieces. They had some high lifts and stuff like that too.
14   Q  So you don't have any personal knowledge of any
15 training or testing or certification policies or procedures?
16   A  Of the Convention Center?
17   Q  Yes.
18   A  No, sir, I have none.
19   Q  And you remember some conversations with Dianne
20 on the date of some incident with Mr. Odeyale?
21   A  I remember a conversation with her that day, but
22 prior to that people from administration during the sales
23 process and the pre-startup went out of their way to make
24 sure we were clear on that issue. Whether that was the
25 general manager of the organization or a different

1 warehouse area.
2    Q  What were on the pallets?
3    A  Cleaning supplies or other items. I can't
4 recall what it was.
5    Q  Was he transporting the pallet from one place to
6 another place?
7    A  Yes, sir.
8    Q  Now, the pallet is the wooden structure on which
9 you would stack other materials?
10   A  Yes, sir.
11   Q  Put it on the forklift, lift it up and carry it
12 off and drop it someplace else?
13   A  Yes, sir.
14   Q  The alternative to the forklift is to carry the
15 individual items from point A to point B?
16   A  Yes.
17   Q  Did you tell Mr. Odeyale that you wanted him to
18 carry the individual items from point A to point B and not
19 use the forklift?
20   A  No, sir.
21      MS. EMIG:  Objection to form.
22   A  No, sir, I did not.
23   Q  Did anyone else tell him that?
24   A  I don't know that answer.
25   Q  Did you tell him not to use the forklift?

Page 57 - Page 60

1  A  Yes, I did.
2  Q  Why did you tell him not to use the forklift?
3  A  I told all of the leadership team clearly in the
4 meetings prior to startup because it was a customer, I will
5 refer to it as such, that would have reviewed with all the
6 other members of the leadership team that they were clear
7 that this was an expectation of the client. Because they
8 were adamant in multiple meetings during the month of
9 September that that was the -- safety was important here.
10  Q  Other facilities where you've been, is there
11 some certification that you seek before allowing an employee
12 to use a forklift?
13  A  The forklift in my experience in the past has
14 never been under my purview of the operation. This
15 particular forklift that we're referring to wasn't something
16 I owned, it wasn't something Aramark was accountable for, it
17 was a client piece of equipment. In other locations such as
18 McCormack Place we were never required to operate forklifts,
19 so I have no experience in that particular piece of
20 equipment.
21  Q  How did you transport --
22  A  Things?
23  Q  -- things from A to B?
24  A  Obviously by hand or they weren't that heavy
25 that required that type of equipment, or we would get people

1 that were, if it was salt coming in for winter that somebody
2 that was a certified operator. I can recall at Navy Pier
3 now that we're talking about it that we had some of them
4 operating pallets, but it wasn't our personnel. We put in a
5 request and it was accomplished.
6  Q  Who drove it?
7  A  The facilities people or whatever at Navy Pier,
8 that was their piece of equipment. I can recall that at
9 Navy Pier now.
10  Q  All right, now, does that conversation refresh
11 your recollection as to any additional difficulties you may
12 have had with Mr. Odeyale with respect to his performance?
13  A  Not other than what I have previously described.
14  Q  All right, now, we've talked about the forklift
15 incident. Have we only one forklift incident?
16  A  Yes, sir.
17  Q  Did you discipline him as a result of the
18 forklift incident?
19  A  Yes, sir.
20  Q  Okay. What was the form of discipline?
21  A  A letter to him from me.
22  Q  Okay.
23  A  Memorandum I guess you would refer to it or
24 written warning, whatever it was entitled.
25  Q  All right, now, you say you also were expecting

1 him to come in and he didn't call and he didn't show up?
2  A  The last work day whatever that was that was the
3 fact, yes.
4  Q  Okay. And you recall it was the last day?
5  A  I think that's what it was when he was resigning
6 was in and around, it was that day. He didn't work after
7 that day of the failing to call.
8  Q  Okay, so there was a time when he was scheduled
9 to work and he didn't show up?
10  A  That's correct.
11  Q  And he never worked again?
12  A  That's correct, he came in for a meeting with me
13 following my calling him at home and inquiring where he was.
14 So he came to the facility to meet with me. We didn't
15 necessarily have a set time or we could have had a set time,
16 I can't remember. I did get him on the phone and requested
17 him to come in and find out what's going on.
18  Q  Tell me about that phone call.
19  A  I know I would have asked the typical question
20 or I feel I would have asked this question to my best
21 recollection of what is going on, why aren't you here.
22  Q  Let me back up a bit.
23      Do you have a present recollection as to what
24 you said to him in the telephone call?
25  A  No, sir, I would have to --

1  Q  Guess?
2  A  Yes, guess, and what my normal answer would be
3 --
4  Q  I'm not asking you to guess. I appreciate your
5 willingness to. Okay. If you remember tell me, but if you
6 don't remember --
7  A  No, sir, it's been over two years.
8  Q  Sure.
9     And that same day you had a meeting with him?
10  A  Possibly. I presume that was the day he came
11 in, yes.
12  Q  And do you have a present memory today without
13 guessing as to what happened at that meeting?
14  A  I remember the document or documents I had from
15 the previous day's issues with me and we were going to be
16 reviewing that I believe, or we visited on those the day
17 before. I can't tell without looking at a line of
18 delineation of documents that provided me a trail. I can
19 just recall he came to the office, whether that was that
20 Thursday or Friday, I had made a phone call that brought him
21 to me requesting his presence to come and explain what's
22 going on.
23     I don't recall in that phone conversation that I
24 asked the question are you sick or ill and he said no.
25 That's why I requested him to come in. I do recall that.

a                                        C&I Basic™

| | |
|---|---|
| 1 correct?<br>2   A  I believe so, yes.<br>3   Q  What caused you to write this document?<br>4   A  My recollection is, as I look down through here,<br>5 Chris came to me I believe and informed me of the situation<br>6 that took place the day before. Chris would have brought<br>7 this to my attention.<br>8   Q  The day before meaning October five?<br>9   A  Yes, it was the day before, either the evening<br>10 of it, yeah, I would say or very early in the morning.<br>11       We were there very early in the mornings and we<br>12 were there very late at night. I can't recall if we talked<br>13 about this the afternoon or the evening before, because the<br>14 incident took place the previous day. I can't tell you if<br>15 Chris brought this information to my attention on the fifth<br>16 or the 6th.<br>17   Q  But the previous day the incident would have<br>18 occurred on October 5th?<br>19   A  Correct.<br>20   Q  According to what this is saying?<br>21   A  Yes.<br>22   Q  And is that the best of your recollection?<br>23   A  Yes, sir, best I can recall.<br>24   Q  So what caused you to write this?<br>25   A  The inappropriate actions that were brought to | 1   Q  Is that your testimony?<br>2   A  Chris had reported to me an incident that he<br>3 observed the previous day or on the 5th.<br>4   Q  In which Mr. Odeyale violated some instruction<br>5 he gave Mr. Odeyale?<br>6   A  Yes.<br>7   Q  What instruction had Mr. Cunningham given, what<br>8 instruction did Mr. Cunningham give to Mr. Odeyale?<br>9   A  Chris Cunningham had observed an employee out on<br>10 a dock area or receiving area and was watching this employee<br>11 wasting time. I can't recall how long of a period this<br>12 observation went on, and then he approached Shola and said<br>13 this guy's been out here a long time, he needs to understand<br>14 he can't waste time out here. You need to go to him and let<br>15 him know that it's inappropriate just to be out here not<br>16 doing anything while he's on the clock. It wasn't a break<br>17 time in his perception and so on and watching his employee<br>18 being there.<br>19       So what was brought to my attention was that he<br>20 had given Shola direct instruction to go over, let the<br>21 employee know that it was unsavory what he was doing and he<br>22 needed to inform this employee that you have got to keep<br>23 working, so to speak, that this was wasting time from Chris'<br>24 perception.<br>25   Q  And how did that directive come to your |
| 1 my attention from Chris on Shola's behalf or things that<br>2 occurred that were not in accordance to instruction that<br>3 Chris would have given Shola the day before.<br>4   Q  What instruction did Chris give Mr. Odeyale that<br>5 you made reference?<br>6   A  Again I need to go through --<br>7   Q  Take your time, review the document and let me<br>8 know when you are finished your review.<br>9   A  I'm terrible with recall. I'll be glancing a<br>10 lot, but this I would have recorded this document in<br>11 sequential information I would have received from Chris.<br>12   Q  Review the document to yourself and tell me when<br>13 you have finished your review.<br>14   A  And your question I'm looking for?<br>15      MS. EMIG:  Could you repeat your question?<br>16      Or is there no question pending?<br>17   Q  Have you finished your review?<br>18      MS. EMIG:  Take your file and review.<br>19   A  I'm not real deep on memory in reading something<br>20 and coming back verbally. I'm sorry. Okay, go ahead again<br>21 the question was?<br>22   Q  I believe your testimony was to the effect that<br>23 Mr. Odeyale in some way violated some instruction that Mr.<br>24 Cunningham gave him?<br>25   A  Yes. | 1 attention?<br>2   A  Because Chris received feedback and that was<br>3 when Shola had approached the situation, he went to other<br>4 supervisors, he didn't handle it himself which was requested<br>5 from Chris. And not only went to say that the person was<br>6 wasting time, but that the instruction given to Shola<br>7 misrepresented what Chris told him because he told these<br>8 other people that weren't in Chris' conversation that this<br>9 employee should be fired and be let go. And that this is<br>10 what Chris Cunningham had told him needed to occur.<br>11   Q  Now, who were the other supervisors?<br>12   A  I can't recall.<br>13   Q  Did you talk to the other supervisors?<br>14   A  No, sir.<br>15   Q  Your writing makes reference to assistant<br>16 operations manager Herman Redden?<br>17   A  Yes, he was the evening operations manager<br>18 there.<br>19   Q  Did you talk to him about the matter?<br>20   A  I can't recall if it was the evening before,<br>21 late, we could have visited on this whole issue the night<br>22 before.<br>23   Q  But you don't know?<br>24   A  No, sir, I don't know for sure.<br>25   Q  You don't have any memory of it or you would |

Page 73 - Page 76

1 tell me?
2    A  I have no memory of it.
3    Q  Now, so was it Chris who brought back to you
4 information that you just related to me that Mr. Odeyale had
5 gone to other people and said this, that and the other?
6    A  My recollection is that Chris came to me and
7 communicated all on this initial incident.
8    Q  Okay, and then what did you do when you got that
9 information from Chris?
10   A  He gave me some of the topical facts or
11 whatever. Then the next morning first thing when Shola came
12 in, and again, I had asked him what happened on the dock,
13 tell me in your words what had happened, because Chris has
14 brought, it had to be the night before, it was early unless
15 Chris was there. I don't think Chris was there. I remember
16 calling Chris into the meeting later in the morning.
17   Q  But tell me what happened.
18   A  I'm told about an incident that took place out
19 there with an employee that was wasting time and I was
20 informed by Shola that Chris had clearly told him to go over
21 to these supervisors and or that employee and fire them.
22   Q  I'm sorry, I don't understand. Are you saying
23 Mr. Odeyale told you that Chris had gone?
24   A  Instructed him.
25   Q  I'm sorry, Mr. Odeyale had been instructed by

1 told to leave the campus, you're fired. I don't know that.
2    Q  Do you know if Chris had talked to Mr. Odeyale
3 about this apparent confusion?
4    A  No, sir, I can't tell you that answer. I mean
5 the evening before?
6    Q  Or at any time before he came to you?
7    A  I don't know.
8    Q  You don't know?
9    A  I don't know.
10   Q  So what did you do about it?
11   A  I listened to his part of the story that was
12 different than what Chris had informed me about and then I
13 either I went and found Chris after we started the meeting
14 one-on-one or Chris came in a little later, something to
15 that effect. And I said and I put the two together and I
16 said now, there's some confusion here, Chris, you've told me
17 this, Shola, you have told me this. And then if I can
18 recall by again reading all this, putting it together that
19 same story came back from Shola that he was told to get rid
20 of this person, fire this person.
21   Q  Do you have a memory of what Mr. Odeyale told
22 you?
23   A  No, sir, I don't. No, I do not.
24   Q  And what happened next?
25   A  After that story was told to me by Shola in

1 Chris Cunningham to go to the supervisors and fire them?
2    A  No.
3    Q  To tell them to get rid of the employee that
4 was wasting time?
5       Mr. Odeyale was telling these other supervisors
6 to get rid of that employee who was wasting time?
7    A  Right.
8    Q  He didn't talk to the employee himself?
9    A  Not to my recollection. It was all handled
10 through someone else.
11   Q  And you didn't talk to these other supervisors?
12   A  No, sir, not that I recall. They didn't
13 approach me in the evening before that I can remember.
14   Q  What did Mr. Odeyale tell you?
15   A  He basically told me that was his side of the
16 story, that Chris had told him to manage this situation
17 exactly that way. So this person needed to be gotten rid
18 of, get rid of this guy. And why Chris came to me the
19 evening before I believe it was, because that was the first
20 thing from his conversation. That was not his instruction.
21 I can't tell you today if this employee was told to go home
22 that night. I can't recall that.
23      But Chris was upset. Chris was upset that his
24 instruction to Shola was different than what was
25 communicated on. And I can't recall if the employee was

1 front of Chris, Chris then took the conversation and said
2 that's not true, that's not what I told you, blah, blah,
3 blah. I mean I reviewed the facts of what really was said.
4 This was Chris speaking for the very first time about the
5 incident and said that's not what I told you to do, I told
6 you do and do this, and that's not what you did.
7       And then after a period of moments or minutes I
8 recall Shola saying I said is that true, and confirming yes,
9 he told me verbally in that meeting in front of Chris, yes,
10 that's what he told me. And I want to think I said why did
11 you do this, he said -- and I don't know if I got an
12 affirmative answer.
13   Q  Do you know if you asked the question?
14   A  Pardon me?
15   Q  Do you know if you asked the question?
16   A  Which question?
17   Q  Why did you do this?
18      You just said I want to believe I said thus and
19 so. Meaning the --
20   A  I know I came back for confirmation that he's
21 telling me this.
22   Q  Do you remember specifically what he said?
23   A  No, sir.
24   Q  Okay. Did you ask Mr. Odeyale to explain the
25 situation?

a                                   C&I Basic™

| | |
|---|---|
| 1    A  Yes.<br>2    Q  Do you remember what he said?<br>3    A  I can recall him telling me what he had told me<br>4 previously without Chris and in front of Chris was not the<br>5 truth. That I do remember.<br>6    Q  What words did he use?<br>7    A  That what he was saying is true.<br>8    Q  What he was saying is true and in that context?<br>9 And he in that context is Chris Cunningham?<br>10   A  Correct.<br>11   Q  So he said what Mr. Cunningham just said is<br>12 true?<br>13   A  Yes, and I have not told you the truth, it was<br>14 inferred somehow verbally.<br>15   Q  Did he say what I have told you is not the<br>16 truth?<br>17   A  I don't recall the exact words.<br>18   Q  So he didn't use those words?<br>19   A  No, I don't know, I can't recall.<br>20   Q  He didn't say -- you can't tell me today he said<br>21 what I told you isn't true?<br>22   A  I can tell you that he recanted the testimony he<br>23 was given me by himself and in front of Chris for the first<br>24 time he had said those two previous things I said happened<br>25 this way didn't really happen that way. | 1 back.<br>2        (Court reporter reads back previous question)<br>3    Q  Mr. Meyer, did you ask Mr. Odeyale specifically<br>4 why he had lied to you?<br>5    A  In reviewing this document I would answer yes, I<br>6 did say that.<br>7    Q  Did you use that word?<br>8    A  Yes.<br>9    Q  Okay. And did you ask him specifically why he<br>10 had lied to others?<br>11   A  Yes.<br>12   Q  Did you use that word?<br>13   A  Yes.<br>14   Q  Okay.<br>15       Did you get any explanation?<br>16   A  Not in return over the incident, no.<br>17   Q  Did you have any difficulty in communicating<br>18 with Mr. Odeyale?<br>19   A  I wouldn't say I had difficulty, no.<br>20   Q  Can you understand him when he speaks?<br>21   A  Yes.<br>22   Q  Does he speak at the proper cadence so that you<br>23 can understand what he's saying?<br>24   A  Yes.<br>25   Q  Do you know where he's from? |
| 1    Q  Did you make any effort to reconcile this<br>2 situation as to why Mr. Odeyale would tell you A and then<br>3 tell you B?<br>4    A  I can't recall.<br>5    Q  Wouldn't that be of interest to you?<br>6    A  I can't recall.<br>7    Q  You don't know whether or not that would be of<br>8 interest to you?<br>9    A  I could have explored that and I could have<br>10 tried to reconcile that, yes.<br>11   Q  I'm not asking you to guess.<br>12   A  I don't know.<br>13   Q  You don't know whether or not it would have been<br>14 of interest to you?<br>15       MS. EMIG: Objection to form.<br>16   Q  Is that correct?<br>17   A  I can't tell you if I explored that avenue with<br>18 him at the time. I can only share with you my tendencies.<br>19   Q  Did you ask Mr. Odeyale whether he had lied to<br>20 others and to you?<br>21   A  I just remember the discovery of hearing the<br>22 story twice from him and Chris.<br>23   Q  Can you answer my question, sir?<br>24   A  Ask it again. I'm sorry.<br>25   Q  Sure. I'll ask the court reporter to read it | 1    A  No, sir.<br>2    Q  Have you worked with other Africans?<br>3    A  Yes.<br>4    Q  Do you have any difficulty understanding other<br>5 Africans?<br>6    A  No.<br>7    Q  You never had any difficulty understanding<br>8 anything Mr. Odeyale said to you?<br>9    A  Not that I can recall.<br>10   Q  Why did you continue his employment after you<br>11 asked him about whether or not he had lied to you and he had<br>12 no explanation?<br>13   A  I think I made the judgment at that particular<br>14 point in time that the best way to manage the situation was<br>15 to document it and make it understood as I would another<br>16 supervisor or manager that this isn't the way we conduct<br>17 business. So the reason he wasn't terminated that day is I<br>18 didn't feel that was the appropriate action to take that<br>19 day.<br>20   Q  Okay, and why didn't you feel it was<br>21 appropriate?<br>22   A  I didn't believe there was -- it was a serious<br>23 enough violation to terminate someone's employment over the<br>24 facts I knew.<br>25   Q  You knew he lied to you so far as you could |