## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
SHOLA ODEYALE,                                      )
                                                    )
        Plaintiff,                                  )        Civil Action No. 1:05cv02250 RMC
                                                    )
v.                                                  )
                                                    )
ARAMARK MANAGEMENT SERVICES                         )
LIMITED PARTNERSHIP,                                )
                                                    )
        Defendant.                                  )
_____             )

### PLAINTIFF ODEYALE'S RESPONSE TO DEFENDANT ARAMARK'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE

Pursuant to Local Civil Rules 7(h) and 56.1, Plaintiff Odeyale responds to Defendant ARAMARK'S Statement of Material Facts as to Which There is No Genuine Issue which Defendant offered in support of its motion for summary judgment.

Many of Defendant's propositions asserted as undisputed material facts are either not material or are obviously disputed or both. Nevertheless, as required by local Civil Rules 7(h) and 56, Plaintiff responds to each of Defendant's asserted material facts including, where appropriate, Plaintiff's view that Defendant's assertion does not affect the outcome of this motion and is therefore immaterial. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986); *Boyd v. Snow,* 335 F.Supp 2d. 28, 33 (D.D.C. 2004) (Collyer, J.).

### ARAMARK Wins The Housekeeping Services Contract For The Washington Convention Center

1

1.      ARAMARK Facilities Services ("ARAMARK") is a corporation that contracts to provide a variety of services to convention centers and other facilities, including, *inter alia*, housekeeping and janitorial services.  *See* Complaint ("Compl.") ¶ 3.

**Plaintiff's Response**:

Plaintiff does not dispute Defendant's assertion.

2.      Throughout the spring of 2004, ARAMARK participated in the process for the housekeeping and janitorial services contract at WCCA.  *See* Excerpts of the Deposition Transcript of Phillip Myers ("Myers Dep.") at 10 attached as Ex. A.

**Plaintiff's Response:**

Plaintiff objects to this assertion as immaterial.  In this context and for purposes of this motion, Plaintiff does not dispute Defendant's assertion.

3.      In late July of 2004, ARAMARK learned that it was the successful bidder on the WCCA contract and subsequently entered into a five-year contract to provide janitorial and housekeeping services.  Myers Dep. 10, Compl. ¶4.   The contract was effective October 1, 2004. Myers Dep. 9.

**Plaintiff's Response:**

Plaintiff does not dispute Defendant's assertion.

**ARAMARK Begins Operations At The Convention Center Under The Direction Of District Manager Phillip Myers**

4.      Phillip Myers, an ARAMARK District Manager, participated in the bid process with respect to the Convention Center contract.   Myers Dep. 10.

**Plaintiff's Response:**

Plaintiff objects to this assertion as immaterial.  In this context and for purposes of this motion, Plaintiff does not dispute Defendant's assertion.

5.  Mr. Myers has been employed with ARAMARK Corporation or its predecessor company for over thirty-one years, primarily in the area of Housekeeping Management.  At the time ARAMARK's bid was accepted, Mr. Myers was a District Operations Manager for ARAMARK's Sports and Entertainment Division.  In this role, Mr. Myers was responsible for three facilities:  McCormack Place Convention Center, Navy Pier, and Greyhound Chicago Maintenance Facility in Chicago, Illinois.  Myers Dep. 10-11.

**Plaintiff's Response**:

Plaintiff does not dispute Defendant's assertion.

6.  At the time ARAMARK's proposal was accepted at the Convention Center, Mr. Myers relinquished his duties at the other three facilities to focus specifically on the start of ARAMARK business at the Convention Center.  Myers Dep. 12.

**Plaintiff's Response:**

Plaintiff objects to this assertion as immaterial.  In this context and for purposes of this motion, Plaintiff does not dispute Defendant's assertion.

7.  At the start-up of the contract, Mr. Myers traveled to the DC area and worked at the Convention Center location for approximately two months.  Myers Dep. 9.  He began at the Convention Center shortly after Labor Day in September of 2004.  Myers Dep. 9.  The Convention Center's contract with ARAMARK went into effect on October 1, 2004 and Mr. Myers left the Convention Center on or about October 23, 2004.  Myers Dep. 9.

**Plaintiff's Response:**

Plaintiff does not dispute Defendant's assertion.

8.      Mr. Myers was only on-site at the Convention Center on a short term basis, for the start up of the contract. Myers Dep. 23.  It was intended that after several weeks, Mr. Myers would no longer be on site, and the daily business would be handled by Mike Noble, who was hired to be ARAMARK's General Manager at the Convention Center.  Myers Dep. 23.

**Plaintiff's Response:**

Plaintiff does not dispute Defendant's assertion.

9.      Mr. Noble began his employment with ARAMARK during the week of October 1, 2004. Myers Dept. 22.  During his first week, Mr. Myers began to get Mr. Noble involved in any decisions that would affect operations going forward.  Myers Dep. 23-24.

**Plaintiff's Response:**

Plaintiff objects to this assertion as immaterial.  In this context and for purposes of this motion, Plaintiff does not dispute Defendant's assertion.

10.     ARAMARK's work force at WCCA included approximately 100 employees. Myers Dep. 14.

**Plaintiff's Response:**

Plaintiff objects to this assertion as immaterial.  In this context and for purposes of this motion, Plaintiff does not dispute Defendant's assertion.

11.     Other managerial employees were present at the Convention Center to assist with the start-up of the business.  Chris Cunningham, an Operations Manager, was also temporarily assigned by ARAMARK to the Convention Center.  *See* Excerpts of the Deposition Transcript of

Christopher Cunningham ("Cunningham Dep.") at 13 attached as Ex. B. In his role as an Operations Manager, Mr. Cunningham was not permanently assigned to the Convention Center or any other facility, but rather he traveled to various facilities, assisting with special projects. Cunningham Dep. 6, 15.

**Plaintiff's Response:**

Plaintiff objects to this assertion as immaterial. In this context and for purposes of this motion, Plaintiff does not dispute Defendant's assertion.

### Myers Recruits and Hires Shola Odeyale, A Former WCCA Employee

12.    Plaintiff Shola Odeyale, a Nigerian born United States citizen, was employed as a Housekeeping Supervisor by WCCA from April of 2001 to September 30, 2004. *See* Excerpts of the Deposition Transcript of Plaintiff Ololade Shola Odeyale ("Odeyale Dep.") at 33 attached as Ex. C.

**Plaintiff's Response:**

Plaintiff does not dispute Defendant's assertion.

13.    In early September, Mr. Odeyale was notified by WCCA that his position was being abolished effective September 30, 2004, because WCCA had decided to outsource its housekeeping functions. *See* Abolishment of Position Notice attached as Ex. D; Odeyale Dep. 40.

**Plaintiff's Response:**

Plaintiff does not dispute Defendant's assertion.

14.    As a result of the WCCA's decision to outsource, Mr. Odeyale was offered and accepted a severance payment of $3899.78. Ex. D; Odeyale Dep. 39.    Mr. Odeyale also

indicated to WCCA that he wished to continue employment with the Housekeeping Contractor. *Id.*

**Plaintiff's Response:**

Plaintiff objects to this assertion as immaterial. In this context and for purposes of this motion, Plaintiff does not dispute Defendant's assertion.

15. During part of September, Mr. Odeyale had taken a leave of absence from the Convention Center for health problems, during which he had gone to New York to stay with his grandmother. Odeyale Dep. 41.

**Plaintiff's Response:**

Plaintiff objects to this assertion as immaterial. In this context and for purposes of this motion, Plaintiff does not dispute Defendant's assertion.

16. Upon his return to the DC Area, Mr. Odeyale received a telephone call from Mr. Myers regarding employment at ARAMARK. Odeyale Dep. at 41. Mr. Myers told Mr. Odeyale that "he [couldn't] wait to see [Mr. Odeyale]" and that he had heard that Mr. Odeyale was the "best manager." Odeyale Dep. 42-43. Mr. Odeyale responded that he too was excited and told Mr. Myers, "I cannot wait to come over there and join them and join the organization." *Id.* at 43.

**Plaintiff's Response:**

Plaintiff does not dispute Defendant's assertion.

17. Mr. Myers requested that Mr. Odeyale come to the Convention Center on September 30, 2004, to apply for a position with ARAMARK. Odeyale Dep. at 44, 54-55.

**Plaintiff's Response:**

Defendant's assertion is disputed. Defendant's assertion is not supported by the material

it cites.   Mr. Odeyale's deposition testimony at page 44 does not indicate that Mr. Myers requested that he come to the Convention Center on September 30, 2004, to apply for a position with Aramark.   Instead, Mr. Odeyale <u>denied</u> that Mr. Myers asked him to submit a job application. (Odeyale Depos., Pl.'s Ex. 1 at 44/15-17).   Mr. Myers asked him to "come early so we can talk" (*Id*. at 44/7-8).   Mr. Odeyale has no memory that Mr. Myers indicated an interest in interviewing him (*Id*. at 44/18-19).

Mr. Odeyale acknowledges that Mr. Myers gave him an "Application For Employment" that he completed when he met with Mr. Myers for the first time (*Id*. at 53/5-55/7).   Mr. Odeyale, however, did not "apply" for the position identified on the Application.   (*Id*. at 55/8-15).

Mr. Odeyale knew, because he had been told by the Washington Convention Center in his August 30, 2004 "Abolishment of Position Notice," that Aramark, as the new contractor for housekeeping services, was

> Required to afford [him] the protections of the Privatization Procurement and Contract Procedures Act of 1993, D.C. Law 10-79, D.C. Code 2-305b.  Those protections are (1) the right of first refusal in a comparable position for which [Mr. Odeyale was] qualified for at least six months and (2) continued employment with the Contractor providing [Mr. Odeyale's] performance is satisfactory after the initial six months.   (Complaint and Answer, ¶ 5).

Aramark admits that Washington Convention Center Authority's Janitorial & Related Services Request for Proposed 04-06, which was incorporated into the August 13, 2004 contract between Aramark and Washington Convention Center Authority, states, in relevant part, that:

> Contractor will be required to afford displaced employees of the Authority the protections of the Privatization Procurement and

> Contract Procedures Act of 1993, D.C. Law 10-79, D.C. Code §2-305b. Those protections are: that Contractor shall offer each displaced Authority employee right of first refusal in a comparable available position for which the employee is qualified for at least a six-month period during which the employee shall not be discharged except for cause; and that Contractor shall, at the end of six months, offer the employee continued employment if the employee's performance is satisfactory.

Answer, ¶ 5.

18.     On September 30, 2004, Mr. Odeyale came to ARAMARK's office at the Convention Center and completed an employment application. Odeyale Dep. 54-55.

**Plaintiff's Response:**

Plaintiff disputes Defendant's assertion as misleading. *See* Plaintiff's Response to Statement of Material Fact, No. 17.

19.     During this initial face-to-face meeting, Mr. Myers again told Mr. Odeyale that people spoke very highly of him, including both housekeepers and management, and welcomed him to ARAMARK. Odeyale Dep. 51.

**Plaintiff's Response:**

Plaintiff does not dispute Defendant's assertion.

20.     Mr. Myers encouraged Mr. Odeyale to apply for the Daytime Operation Project Manager position - a more senior position. *See* Application for Employment attached as Ex. E; Odeyale Dep. 55. Mr. Myers told Mr. Odeyale that this managerial position would become open once ARAMARK operations were in full swing. Odeyale Dep. 55.

**Plaintiff's Response:**

Plaintiff disputes Defendant's assertion. Defendant's assertion is not supported by the material it cites. Mr. Odeyale's deposition testimony at page 55 does not indicate an Operation

Project Manager's position is "more senior" than any other position.  Instead, Mr. Odeyale was asked whether the Operation Project Manager's position was "more senior" than a supervisor position and said, "I don't know." (*Id*. at 55/15-56/6); (*See* Plaintiff's Response to Statement of Material Fact, No. 17).

21.    Mr. Odeyale was hired by Mr. Myers as a Housekeeping Supervisor.  Odeyale Dep. 57.  Mr. Myers told Mr. Odeyale that in this position he would be doing what he had done previously during his employment with WCCA.  *See* Job Description attached as Ex. F; Odeyale Dep. 58.

**Plaintiff's Response:**

Plaintiff disputes Defendant's assertion as misleading and incomplete.  Mr. Myers did not "hire" Mr. Odeyale as D.C. Law 10-79, D.C. Code 2-305(b) vested Mr. Odeyale with an entitlement to the subject position.  *See* Plaintiff's Response to Statement of Material Fact No. 17.  In addition, because Mr. Odeyale had served Washington Convention Center as a Building Service Supervisor, (*id*. at 38/4-12), he reasonably expected the same employment at Aramark. (*Id*. 39/5-15). Mr. Myers provided Mr. Odeyale a different job:

> He told me to follow him to the big storage room.  I'm to be rearranging and moving heavy stuff . . . like sands . . . in the bag and snow salt, chemicals and some other things . . . [H]e told me to move all the stuff on the floor and rearrange it and put it away somewhere (*Id*. at 67/4-68/14).

Mr. Odeyale observed that "[w]orking in the storage room, moving heavy stuff, so that's not what I was doing at the Convention Center." (*Id*. at 170/2-4).  When employed by the Convention Center, Mr. Odeyale "monitor[ed] people working over there [in the storage room]. [He] supervised[d] people that work over there." (*Id*. at 70/16-17)

9

22. Mr. Myers intended for Mr. Odeyale to work in a relief supervisory capacity. Organizational chart attached as Ex. G; Myers Dep. at 15. As a relief supervisor, he would fill in for supervisors who were out on a given day. Myers Dep. at 15. As such, this relief supervisory position might entail different duties each day. *Id.*

**Plaintiff's Response:**

Plaintiff disputes Defendant's assertion. Mr. Myers, for the duration of Mr. Odeyale's employment with Aramark, "confined [Mr. Odeyale] into the storage room" (*Id.* at177/12-14) and assigned him "permanently" to work there. (*Id.* at170/5-8).

### Mr. Odeyale Worked For ARAMARK for Only Four Days

23. Mr. Odeyale only worked at ARAMARK for four days. Odeyale Dep. 66. He reported for his first day of work on Friday, October 1, 2004. Odeyale Dep. 50, 62. He then worked Saturday, October 2, and Tuesday, October 5, 2004. Odeyale Dep. 65. His last day of work was Wednesday, October 6, 2004. Odeyale Dep. 65. These are the only days Mr. Odeyale worked for ARAMARK. Odeyale Dep. 66.

**Plaintiff's Response:**

Plaintiff does not dispute Defendant's assertion.

### Mr. Odeyale Was Upset About His Initial Work Assignment

24. When ARAMARK took over the contract at the Convention Center, WCCA maintained supplies in the warehouses and storerooms. Myers Dep. 16. On the day that the contract began, ARAMARK was able to move and organize WCCA's inventory and replace it with its own. *Id.* The storerooms housed equipment, chemicals, disposable items, paper towels, plastic bags, cleaning supplies, etc. Myers Dep. 17.

**Plaintiff's Response:**

Plaintiff disputes Defendant's assertion as incomplete and misleading.  The storage room also housed heavy materials such as sand, snow salt and the like.  *See* Statement of Material Fact No. 21.

25.    During the four days that Mr. Odeyale was employed by ARAMARK, he was assigned to work in the warehouse and storeroom areas.  Odeyale Dep. 170.  Mr. Myers asked Mr. Odeyale to rearrange some of the supplies in the storeroom.  Myers Dep. 29.

**Plaintiff's Response:**

Plaintiff disputes Defendant's assertion as misleading.  *See* Plaintiff's Response to Statement of Material Fact No. 21.

26.    Mr. Odeyale was tasked with "the logistical set up and getting ready for us to be efficient with our business of setting up that major warehouse…and our store rooms that would be holding supplies or equipment."  Myers Dep. 29.

**Plaintiff's Response:**

Defendant's assertion is disputed as misleading.  *See* Plaintiff's Response to Statement of Material Fact No. 21.

27.    Upon receiving this assignment, Mr. Odeyale tried to explain to Mr. Myers that the storage room was already set up as it should be.  Odeyale Dep. 68.  In fact, under his previous employer, WCCA, Mr. Odeyale had helped to set up the storage room the way it was. Odeyale Dep. 68.  As he described it, the storeroom was arranged so employees could access equipment or chemicals in a timely manner.  Odeyale Dep. 71.  According to Mr. Odeyale, the general consensus was that it was "perfect."  Odeyale Dep. 68.

**Plaintiff's Response:**

Plaintiff disputes Defendant's assertion as incomplete and misleading.  Mr. Odeyale had experience setting up the storage area at the Convention Center.  He supervised the workers who set it up previously (*id.* at 70/16-17); the Convention Center's General Manager and its Director had reviewed it and approved his lay-out as "perfect." (*Id.* at 68/6-9).

Mr. Odeyale was concerned with Mr. Myers' directions about where he wanted Mr. Odeyale to put the "the heavy stuff." (*Id.* at 69/18-70/6).  Mr. Myers "wanted [Mr. Odeyale] to put all the heavy stuff on the top top shelf and the light light stuff, he wanted that to be on the floor" (*Id.* at 71/10-14).  Mr. Odeyale told him "I don't think that's a good idea . . . " but that's how Mr. Myers wanted it (*Id.* at 71/15-72/1).  The problem, of course, was that if one had to move the "heavy stuff" from the top shelf, it was going to be "very, very difficult" (*Id.* at 70/3-6). Mr. Odeyale wanted to set up the storeroom so employees could get what they needed in a timely manner and without getting hurt.  (*Id.*  at 70/21-71/3)

Mr. Odeyale testified that he understood Mr. Myers was his supervisor.  "I was talking to him very cautiously." (*Id.*  at 68/2-6).

28.    Despite Mr. Odeyale's suggestions, Mr. Myers wanted the storeroom to be rearranged.  Odeyale Dep. 70-71.  Mr. Odeyale again told Mr. Myers that this wasn't a good idea.  Odeyale Dep. 71.  Nevertheless, Mr. Myers instructed Mr. Odeyale to re-arrange the items in the storage room.

**Plaintiff's Response:**

Plaintiff disputes Defendant's assertion as incomplete and misleading.  (*See* Plaintiff's Response to Statement of Material Fact No. 27).

29.     Mr. Odeyale did not feel that the way Mr. Myers was directing him to organize the storeroom was appropriate.  Odeyale Dep. 92.

**Plaintiff's Response:**

Plaintiff disputes Defendant's assertion as incomplete and misleading.  (*See* Plaintiff's Response to Statement of Material Fact No. 27).

30.     Although Mr. Myers never told Mr. Odeyale that he would be asked to work in the storeroom on a long-term basis, Mr. Odeyale did not feel that his work during the first week was a supervisor's work.  Odeyale Dep. 92, 170.  "I'm supposed to be a supervisor, but that's not what I'm doing."  *Id.* at 92.

**Plaintiff's Response:**

Plaintiff does not dispute Defendant's assertion.

**Mr. Myers Writes A Disciplinary Memo to Mr. Odeyale Following An Incident With Chris Cunningham**

31.     On October 6, the last of the four days he worked, Mr. Odeyale was asked to assist Chris Cunningham.  Odeyale Dep. 84.

**Plaintiff's Response:**

Plaintiff disputes Defendant's assertion as incomplete and misleading.  Mr. Odeyale testified at deposition that Mr. Cunningham "came to the storeroom and he asked me if I can follow him to the hall and show him something . . . so I was showing him the emergency doors, the exit doors and, you know, the halls, particularly a hall." (*Id*. at 84/14-85/21).

32.     Mr. Odeyale was showing Mr. Cunningham parts of the facility and they saw an employee, Gerald Willis, "sitting down doing nothing."  Odeyale Dep. 84, 86, 88.    Mr. Cunningham told Mr. Odeyale to advise Mr. Willis to "go to work."  *Id.* at 86.

13

**Plaintiff's Response:**

Plaintiff objects to this assertion as immaterial. In this context and for purposes of this motion, Plaintiff does not dispute Defendant's assertion.

33.    Later in the day, Mr. Cunningham approached Mr. Odeyale again and told him that Mr. Willis was still wasting time. Odeyale Dep. 87. According to Mr. Odeyale, Mr. Cunningham told him to speak to Mr. Willis' direct supervisor, Juanita Jones, and tell her that she needed to "get rid of that guy." Odeyale Dep. 87. Mr. Odeyale communicated this to Ms. Jones. Odeyale Dep. 94, 96.

**Plaintiff's Response:**

Plaintiff objects to this assertion as immaterial. In this context and for purposes of this motion, Plaintiff does not dispute Defendant's assertion.

34.    Phil Myers learned about this incident the next day. Myers Dep. 75. Mr. Cunningham told Mr. Myers that he had given Mr. Odeyale a direct instruction to tell the employee to stop wasting time and that Mr. Odeyale had not handled the situation the way that Mr. Cunningham had requested of him. Myers Dep. 75-76. Mr. Myers learned that Mr. Odeyale had told other people that Mr. Willis should be fired, instead of handling the situation himself. Myers Dep. 76.

**Plaintiff's Response:**

Defendant's assertion relies on inadmissible hearsay and assumes facts not in evidence; it is disputed and immaterial.

Mr. Cunningham's deposition testimony is at odds with Defendant's assertion. He testified that he cannot remember having any difficulty with Mr. Odeyale. (Cunningham Depos.,

14

Pl.'s Ex. 2, at 26/7-8). Mr. Odeyale testified that Mr. Cunningham told him to tell the supervisor that she should "get rid of that guy" and that he did what Mr. Cunningham told him to do. (Odeyale Depos., Pl.'s Ex. 1, at 86/12-88/2).

35.    Based on this information, Mr. Myers approached Mr. Odeyale and asked him what had happened. Myers Dep. 77. After learning Mr. Odeyale's side of the story, Mr. Myers testified that he brought Mr. Cunningham into the meeting. After Mr. Cunningham explained what he had said, Mr. Odeyale admitted that what he had previously told Mr. Myers about the incident may not have been true. Myers Dep. 80-81.

**Plaintiff's Response:**

Plaintiff disputes Defendant's assertion and objects to it as inadmissible hearsay. (*See* Plaintiff's Response to Statement of Material Fact No. 34).

36.    Mr. Myers counseled Mr. Odeyale that this was not the way that ARAMARK supervised its employees and prepared a memorandum documenting the discussion. *See* Memorandum from Phil Myers to Shola Odeyale dated October 6, 2004 attached as Ex. H; Myers Dep. 84.

**Plaintiff's Response:**

Plaintiff disputes Defendant's assertion and objects to Defendant's Memorandum as hearsay. Mr. Odeyale had not seen the subject document before his deposition. (Odeyale Depo., Pl.'s Ex. 1 at 95/1-16). When asked if he discussed such an incident with Mr. Meyer he gave two answers: "I don't remember, no." (*Id.* at 95/18-20). (*See* Plaintiff's Response to Statement of Material Fact No. 34).

37.    Mr. Odeyale has no recollection of ever discussing the Gerald Willis incident with Mr. Myers.  Odeyale Dep. 95.

**Plaintiff's Response:**

*See* Plaintiff's Response to Statement of Material Fact No. 34.

**Mr. Odeyale Was Disciplined For Unauthorized Use of the Forklift**

38.    At the start up of the contract, WCCA emphasized to ARAMARK management that WCCA's policies should govern the operation of equipment, including forklifts, in the facility.  Myers Dep. 56-57.  Specifically, ARAMARK employees needed to be trained and certified to operate equipment and WCCA would manage that certification process.  Myers Dep. 57.  WCCA administration communicated this to Mr. Myers before the contract started in October.  Myers Dep. at 56-57.

**Plaintiff's Response:**

Plaintiff objects to this assertion as immaterial.  In this context and for purposes of this motion, Plaintiff does not dispute Defendant's assertion.

39.    Diane Nelson, a WCCA manager, was to provide whatever training and education was needed on equipment.  Myers Dep. 57.

**Plaintiff's Response:**

Plaintiff objects to this assertion as immaterial.  In this context and for purposes of this motion, Plaintiff does not dispute Defendant's assertion.

40.    On October 6, Mr. Odeyale told Mr. Myers that he wanted to use the forklift.  Odeyale Dep. 118.  Mr. Odeyale communicated that he had used the forklifts in the past.  Myers Dep. 59.

**Plaintiff's Response:**

Plaintiff disputes Defendant's assertions as incomplete and immaterial. Mr. Myers testified he did not know what training, testing or certification Mr. Odeyale had with respect to the forklift and, as of October he did not know what experience he may have had with the forklift. Defendant's assertion is not supported by the material it cites. Because Mr. Odeyale was required to move "heavy stuff on the pallet." (Odeyale Depos., Pl.'s Ex. 1 at 118/19-20), he asked and received Mr. Myers' permission to use the Convention Center's fork lift. (*Id.* at 117/19-118/9).

41.     Later in the day, Mr. Myers was informed by Ms. Nelson that Mr. Odeyale had not completed the requisite testing or certification process. Myers Dep. 58, 59-60.

**Plaintiff's Response:**

Plaintiff disputes Defendant's assertion as inadmissible hearsay and immaterial. In addition, Plaintiff was trained (but not certified) on how to drive a forklift. (*Id.* at 119/17-120/1).

42.     Mr. Myers, along with Diane Nelson, approached Mr. Odeyale and told him to stop driving the forklift. Myers Dep. 61; Odeyale Dep. 120. Mr. Myers asked Mr. Odeyale why he didn't tell him that he wasn't permitted to use the forklift. Odeyale Dep. 121.

**Plaintiff's Response:**

Plaintiff objects to this assertion as immaterial. In this context and for purposes of this motion, Plaintiff does not dispute Defendant's assertion.

43.     Mr. Myers was very angry, and Mr. Odeyale testified that he looked like he was going to strike him. Odeyale Dep. 122.

17

**Plaintiff's Response:**

Plaintiff does not dispute Defendant's assertion.

44.      Ms. Nelson also reiterated Mr. Myers' position to Mr. Odeyale, saying, "Shola, you (sic) supposed to be certified to be operating the forklift."  Odeyale Dep. 124.

**Plaintiff's Response:**

Plaintiff disputes Defendant's assertion as inadmissible hearsay and because it assumes facts not in evidence and is immaterial.

45.      Mr. Odeyale admits that he was not certified to drive the forklift.  Odeyale Dep. 124.

**Plaintiff's Response:**

Plaintiff disputes Defendant's assertion as immaterial, incomplete and misleading.  Mr. Odeyale agrees he was not certified; he was trained by Nelson to drive the fork lift.  (*Id*.  at 119/17-120/2).

46.      As a result of this incident, Mr. Myers asked Mr. Odeyale to return the forklift key and prepared a written disciplinary warning for Plaintiff.  *See* Memorandum from Phil Myers to Shola Odeyale dated October 6, 2004 attached as Ex. I; Odeyale Dep. 124; Myers Dep. 62.

**Plaintiff's Response:**

Plaintiff disputes Defendant's assertion as immaterial, incomplete, misleading and hearsay.  Mr. Odeyale agrees that Mr. Myers asked him for the forklift key. (*Id*. at 124/9-15). However, while Mr. Myers claimed "written disciplinary warning for Plaintiff" purports to

18

represent that Mr. Odeyale received a copy of the claimed "written disciplinary warning," Mr.

Odeyale never received such a warning from Mr. Myers. (*Id.* at 125/3-126/11).

### Mr. Odeyale Alleges That Mr. Myers "Tortured" Him In the Storeroom

47.    Plaintiff's Complaint alleges a single incident where Mr. Myers allegedly became

physical and used a racially derogatory name with the Plaintiff.  Specifically, the Complaint

alleges the following:

> On/about October 5, 2004 when Plaintiff addressed his supervisor
> with his concerns regarding his job assignment, Defendant
> ARAMARK's supervisor, Phil Myers, grabbed Plaintiff by his
> clothing, putting Plaintiff in fear of imminent physical harm,
> pushed Plaintiff causing him to injury his head (sic) and called
> Plaintiff a racially derogatory name.

Compl. ¶12.

**Plaintiff's Response:**

Plaintiff disputes Defendant's assertion as immaterial.  There has been no suggestion that

Plaintiff's complaint is deficient.  *See Swierkiewicz v. Serena N.A* , 534 U.S. 506 (2002).

48.    At his deposition, Mr. Odeyale testified that this incident occurred the same day

that Mr. Odeyale was disciplined for using the forklift, October 6, 2004.  Odeyale Dep. 130-131.

**Plaintiff's Response:**

Plaintiff disputes Defendant's assertion  as immaterial and misleading.  Mr. Odeyale did

not testify that he was "disciplined" for using the forklift.  (*See* Plaintiff's Response to Statement

of Material Fact No. 46).

49.    He further testified that he was standing on a ladder in the storeroom when Mr.

Myers approached him, raised his voice to Mr. Odeyale, began calling him names, and grabbed

his pants and pulled him and the ladder over on to the ground.  Odeyale Dep. 132-133.  Odeyale

Dep. 132.  Mr. Odeyale alleges that when he was pulled off the ladder, he suffered injuries to his head and back.  Odeyale Dep. 136.

**Plaintiff's Response:**

Plaintiff does not dispute Defendant's assertion except as incomplete.  The assertion should, but does not, include a statement to the effect that during the subject incident Mr. Myers called Plaintiff a "N----r".  (*Id*. at 132/17-134/13).

50.    There are no other allegations in Plaintiff's Complaint about racial hostility or harassment.  *See generally* Compl.

**Plaintiff's Response:**

Plaintiff does not dispute Defendant's assertion except as immaterial.  There has been no suggestion that Plaintiff's complaint is deficient.  *See Swierkiewicz v. Serena N.A*, 534 U.S. 506 (2002).

51.    At his deposition, Mr. Odeyale broadened and elaborated on the nature of his claims.  He testified that Mr. Myers called him names, including the N word, "frequently."  Odeyale Dep. 141.   Mr. Odeyale alleges that he was confined to the storage room, moving heavy objects, when he was supposed to be supervising employees.  Odeyale Dep. 93.  According to Odeyale, Mr. Myers, the district manager, spent the majority of his day in the storeroom with Mr. Odeyale, drinking coffee.  Odeyale Dep. 81.

**Plaintiff's Response:**

Plaintiff disputes Defendant's assertion as incomplete and misleading in several respects.

Plaintiff responded as appropriate to Defendant's questions at deposition and testified that Mr. Myers used the "N" word in reference to Mr. Odeyale "frequently."  Mr Myers used the

"N" word when he caused Mr. Odeyale to fall to the floor from the ladder on October 6, 2004 (*see* Plaintiff's Response to Statement of Material Fact No. 49) as well as "before and after that incident." (*Id*. at 134/10-13).  Mr. Myers also taunted Mr. Odeyale with the "N" word, and its ugly meaning as used in the United States and tried to force Mr. Odeyale to say the word.  (*Id*. at 180).  In addition to the foregoing, Mr. Myers said and did other things to Mr. Odeyale that a reasonable jury could conclude were motivated by Mr. Myers' racial animus towards him.  (*See* Plaintiff's Response to Statement of Material Fact No. 52).

Defendant's assertion that Mr. Odeyale testified at page 81 of his deposition that Mr. Myers "spent the majority of his day in the storeroom with Mr. Odeyale, drinking coffee" is disputed.  Instead, Mr. Odeyale was asked at page 81 of his deposition, "[b]ut would he spend the majority of his time in the storeroom with you besides for smoke breaks?" and responded, "I don't know." (*Id*. at 81/8-16)

52.    During his testimony, Mr. Odeyale also described the following incidents or allegations regarding his employment at ARAMARK:

On two occasions, Odeyale alleges that Myers did not permit him to take breaks to take his diabetes medication.  Odeyale Dep. 174, 177-178.  According to Mr. Odeyale,

> [H]e did not let me take my 15 minutes break, he did not let me take nothing, but I need to take my medicine.  I just came back. You know I just came back from my sick leave.  Please.  I'm begging him.  I beg you, Phil, please don't kill me.  Let me go and take medicine. He said medicine?  I show it to him.  I wrap it in the paper towel.  I show it to him.  I have to take this.  He said no no no.  You listen to me.  N word.  Go and do your job.  Go and do this.  I don't care.  And I was sweating.  He say I don't care.

Odeyale Dep. 174.

21

Odeyale alleges that Myers called him names, including "nigger," "sickler," "African Chicken," and "asshole."  Odeyale Dep. 178, 181, 259.  Mr. Odeyale describes Mr. Myers:

> "telling me to be looking at the letter N on the boxes.  So he told me to be looking at those letter and tell him what the N stand for. . . . And Phil Myers told me no, you didn't get it.  You didn't get the popular one in America, dummy.  He is referring to me.  He said, you dummy, you don't know what the N stand for.  You telling me you live in America for a long time.  You don't know what the letter N stand for.  Letter N stand for nigger, man.  Nigger.  It's nigger. So the way to pronounce it.  He said what did I saw.  I said you say N.  So he say no, I want you to say it.  Then I was crying. I said no, I'm not going to say it.  Then I was crying.  I said this is tortured.  You are torturing me."

Odeyale Dep. 181.

Odeyale alleges Myers made comments about Mr. Odeyale's passport and called him a "dummy."  Odeyale Dep. 182.  He testified:

> Phil Myers was looking at my U.S., my passport, and he said, who gave you the passport?  And I said, President Bush.  He said you dummy.  President Bush is a dummy too.  Whoever give you the passport, everybody is a dummy.  They give you citizenship and just, just anyhow.  He said he can't believe that people like you will give you a citizenship.  Whoever give you is a dummy.  You too, you a dummy.

Odeyale Dep. at 182.

Odeyale alleges Myers made fun of his Democratic affiliation and crumpled his voter registration card.  Odeyale Dep. 184.  According to Mr. Odeyale, "I say I am a registered Democrat.  And he says you?  I said yes, I'm a registered Democrat.  And I show him my

voter registration card in my pocket…And he rip it – he squeeze it and he threw it at me."

Odeyale Dep. 184.

**Plaintiff's Response:**

Plaintiff does not dispute Defendant's assertions.

53.    In support of his allegation that he was called the N-word, Plaintiff submitted the

Declaration of Selita Janey, a security guard for WCCA stating that she "heard Mr. Myers call

Mr. Odeyale a "nigger" in a loud voice."  At her deposition, however, Ms. Janey testified that the

declaration was not true and correct and that she wished to withdraw it.  *See* Excerpts of the

Deposition Transcript of Selita Janey ("Janey Dep.") at 23, 44-45, 58 attached as Ex. J.

**Plaintiff's Response:**

Plaintiff disputes Defendant's assertions as incomplete and misleading.  Selita Janey

signed a Declaration within weeks of the subject incident in 2004, wherein she stated as follows:

> I, Selita Janie, state as follows:
> During my shift (2:30 p.m. – 11:30 p.m.) on or about October 5, 6
> or 7, 2004, while doing my security rounds, I heard an exchange
> between Shola Odeyale and Phil Myers.
> I heard Mr. Myers call Mr. Obeyale a "nigger" in a loud voice.
> I did not hear Mr. Obeyale raise his voice during the exchange.
> I declare under penalty of perjury that the foregoing is true and correct.
> Executed on October 18, 2004.

(Pl.'s Ex. 3; Janey Depos., Pl.'s Ex. 4, at 30/8-32/4)

Ms. Janey testified at deposition that she talked with one of Plaintiff's counsel (Cynthia

Duffe) who prepared the Declaration and presented it to Ms. Janey for her review, and that she

signed her Declaration after reviewing it.  (*Id*. at 43/9-14).  When she signed the Declaration, she

said, "I was certain that that's what transpired." (*Id* at. 44/9-13).  She understood that what she

signed was "true and correct." (*Id*. at 52/12-21).

23

Defendant's assertion that Ms. Janey's Declaration is "not true and correct" is not supported by the material cited. At deposition, Ms. Janey agreed that when she made the Declaration she was "certain" that she heard Mr. Myers call Mr. Odeyale a "N-----r" (*id.* at 44/12-13), but now she would like to withdraw it, (*id.* at 58/4-9) because, after talking with a friend about the matter, she concluded

> So, I, like, thought I had heard, you know, something that, you now, wasn't , you know, right, and I later discussed it with someone, a friend of mine, and they were, like, are you sure? I was, like, well, I can't say I'm 100 percent sure that's what was said, but, you know, I'm kind of thinking it was. And then when, you know, it was said that, you know – I don't know, I just –my—the point I'm trying to make is I can't say 100 percent that – you know, that that gentlemen called him a nigger. I can't say 100 percent whether he did.
> Initially I said that he did, because that's what I thought I may have heard, but because of the distance and the echo and what have you, I've been thinking about it since then and – well, not lately, of course, but after the incident occurred, you know, I had given it some thought, and I was like, well, I don't think I would sit well really, you know, saying 100 percent that's what that gentleman said if, in fact, that was not.
> Q. Okay.
> A. So, now I'm saying I'm uncertain as to what he said.

> (*Id.* at 23/1-24/3)

54.    Mr. Odeyale has no recollection of how many times, or on which days Mr. Myers called him the N-word, but testified that it occurred "frequently." Odeyale Dep. 141, 260.

**Plaintiff's Response:**

Plaintiff does not dispute Defendant's assertions.

24

**Mr. Odeyale Alleges that Mike Noble, General Manager, Terminated His Employment**

55.    Mr. Odeyale alleges that he went to the General Manager, Mr. Noble, on October 7, to report the events of October 6.  Odeyale Dep. 128.   Mr. Odeyale claims that he explained how Mr. Myers had pulled him off the ladder, that he would not let him take his medication, and that he was forcing him to move heavy items without any help.  Odeyale Dep. 129.  Mr. Odeyale further claims that he explained that Mr. Myers called him a sickler, the N-word, and a chicken. Odeyale Dep. 130.

**Plaintiff's Response:**

Plaintiff does not dispute Defendant's assertions except as incomplete.  Mr. Odeyale showed Mr. Noble where on his forehead he hit his head when Mr. Myers "pushed me from the ladder, like swing me or push me."  (Odeyale Depos., Pl.'s Ex. 1 at 128/22-129/4).  Mr. Myers offers a different view of Mr. Odeyale's visit.  Mr. Myers says he was present and Mr. Noble made no contribution to the conversation, "[n]one whatsoever."  (Myers depos., Pl.'s Ex. 5 at 22/18-20), that "Mike was primarily there as a witness" (*id*. at 23/3-4), and that Mr. Odeyale "resign[ed] and quit[ ]."  (*Id*. at 22/1-2).

56.    According to Mr. Odeyale, in response to his complaints, Mr. Myers told him "Phil Myers don't like you, he cannot work with you, so you're terminated."  Odeyale Dep. 130.

**Plaintiff's Response:**

Plaintiff disputes Defendant's assertions as incomplete.  Mr. Myers offers a different view of Mr. Odeyale's termination.  According to Mr. Myers, he and Mike Noble met with Mr. Odeyale.  (Myers Depos, Pl.'s Ex. 5 at 18/15-20/4).  Mr. Noble said nothing.  (*Id*. at 22/18-23/5) Mr. Odeyale resigned. (*Id*.).3

57.    Mr. Noble told Mr. Odeyale that his paycheck would be ready on October 22. Odeyale Dep. 151.

**Plaintiff's Response:**

Plaintiff disputes Defendant's assertions as incomplete. *See* Statement of Material Fact No. 55 and Plaintiff's response.

58.    Mr. Odeyale doesn't know whether Mr. Noble terminated his employment because of his race. Odeyale Dep. 179-180. Mr. Odeyale never heard Mr. Noble use racially derogatory language. Odeyale Dep. 159-160.

**Plaintiff's Response:**

Plaintiff does not dispute Defendant's assertions.

59.    Following this conversation, Mr. Odeyale claims that he attempted to report his termination to WCCA's Human Resources office. Odeyale Dep. 147. He contends that he wanted to report the termination to Ms. Benkins, Director of Administration, because he felt that pursuant to Convention Center's letter, ARAMARK was obligated to employ him for a period of six months. Odeyale Dep. at 148; Ex. D. He further alleges that he was unable to see Ms. Benkins that day and so he left. Odeyale Dep. at 149-150. Mr. Odeyale has no recollection of whether he reported the incident to anyone else in WCCA Human Resources. *Id.*

**Plaintiff's Response:**

Plaintiff does not dispute Defendant's assertions.

Respectfully submitted:

_____/s Michael J. Hoare__ _____

Michael J. Hoare
MICHAEL J. HOARE, P.C.
1101 14th Street, NW
Suite 710
Washington, DC  20005
(202) 408.7901
Fax:  (202) 408.7903
mjh@michaeljhoare.com
Attorney for Plaintiff

Dated:  April 10, 2007