IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

SHOLA ODEYALE,                )
        Plaintiff,            )
    vs.                       ) Civil Action
ARAMARK MANAGEMENT            ) 1:05CV02250 RMC
SERVICES LIMITED              )
PARTNERSHIP,                  )
        Defendant.            )

- - - - -

The deposition of SELITA JANEY was taken on Tuesday, December 5, 2006, commencing at 11:01 a.m., at the offices of Morgan Lewis, 1111 Pennsylvania Avenue, N.W., Washington, D.C., before Susanne Bergling, Registered Merit Reporter and Notary Public.

- - - - -


PLAINTIFF'S EXHIBIT 4

Page 22

1  about that conversation?
2      A.  She brought me in. She asked me a few
3  questions. I answered the questions. And that
4  was pretty much it.
5      Q.  What did her questions pertain to?
6      A.  The situation between Mr. Shola and the
7  Aramark supervisor.
8      Q.  Okay. Can you describe for me that
9  situation between Mr. Odeyale and the Aramark
10 supervisor?
11     A.  Okay, of course, you understand it's
12 been a while, and as I stated initially when I
13 first spoke to Ms. Duffe, I was a distance away.
14 I was on the house dock, coming down the house
15 dock area, making my rounds, checking my areas.
16 Mr. Shola -- and I'm not sure what the
17 gentleman's name was, but he worked for
18 Aramark -- were having like a conversation that
19 had became heated because their -- the volume of
20 their voices had raised, and down in that area,
21 it's kind of echoey, because again, it's a
22 loading dock.

Page 23

1       So, I, like, thought I had heard, you
2  know, something that, you know, wasn't, you
3  know, right, and I later discussed it with
4  someone, a friend of mine, and they were, like,
5  are you sure? I was, like, well, I can't say
6  I'm 100 percent sure that's what was said, but,
7  you know, I'm kind of thinking it was. And then
8  when, you know, it was said that, you know -- I
9  don't know, I just -- my -- the point I'm trying
10 to make is I can't say 100 percent that -- you
11 know, that that gentleman called him a nigger.
12 I can't say 100 percent whether he did.
13      Initially I said that he did, because
14 that's what I thought I may have heard, but
15 because of the distance and the echo and what
16 have you, I've been thinking about it since then
17 and -- well, not lately, of course, but after
18 the incident occurred, you know, I had given it
19 some thought, and I was like, well, I don't
20 think I would sit well really, you know, saying
21 100 percent that's what that gentleman said if,
22 in fact, that was not.

Page 24

1      Q.  Okay.
2      A.  So, now I'm saying I'm uncertain as to
3  what he said.
4      Q.  Okay. Well, let me just ask you a few
5  follow-up things about that.
6      A.  Sure.
7      Q.  You were on the house dock?
8      A.  Um-hum.
9      Q.  And how far away would you say
10 Mr. Odeyale and Mr. Myers were?
11     A.  I'm not good with that, so that's why
12 I'm thinking. Fifty feet?
13     Q.  Okay. And is the house dock separate
14 from the loading dock?
15     A.  Well, we have a couple of -- there's
16 like three different loading dock areas.
17     Q.  Okay.
18     A.  You have the house dock area, which is
19 in the north building right below where the
20 facility operations offices are, and adjacent to
21 that is like central plant, and that's where
22 like the engineers and the PEPCO people are.

Page 25

1  Then you have the A, B and C loading dock, which
2  is down on the very bottom underneath the
3  building on the very bottom of the building, you
4  know, the lower half. And then you have D and E
5  dock, which is upstairs.
6      Q.  Okay.
7      A.  So, your question again was?
8      Q.  Were you -- which loading dock area
9  were you in of the three that you've just --
10     A.  The house dock.
11     Q.  The house dock?
12     A.  Um-hum.
13     Q.  And was Mr. Odeyale and Mr. Myers or
14 the supervisor that you witnessed, were they in
15 the same --
16     A.  They were in the vicinity, yeah.
17     Q.  Okay. And you said it was a heated
18 conversation. Why did you think that?
19     A.  I noticed it because, I mean, they were
20 kind of loud. I mean, you hear the
21 conversation, and then because it's echoey, you
22 know, you're still not thinking anything of it,

Selita Janey Shola Odeyale v. Aramark Management Services Limited Partnership    12/5/2006

Page 30

1  Mr. Odeyale physically touch one another during
2  this exchange or --
3      A.  No.
4      Q.  -- become violent in any way?
5      A.  Not when I was there, no.
6      Q.  Okay.  I'd like -- I am going to show
7  you a document.
8          Can we mark this as Exhibit 1?
9          (Janey Deposition Exhibit Number 1 was
10 marked for identification.)
11         BY MS. EMIG:
12     Q.  You can take a second to review the
13 document.
14     A.  (Document review.)  Okay.
15     Q.  Do you recognize this --
16     A.  Do you want this back?
17     Q.  No, you can keep that one.
18     A.  Oh, okay.
19     Q.  Do you recognize this document?
20     A.  I do.
21     Q.  Can you identify it for me or --
22     A.  This is what I had initially told

Page 31

1  Ms. Duffe.
2      Q.  Okay.  And is that your signature?
3      A.  It is.
4      Q.  Okay.  Have you reviewed this document
5  at all recently or have you seen it since you
6  initially --
7      A.  I've seen it since I initially signed
8  off on it, yeah.
9      Q.  Okay.  Who prepared this document?
10     A.  Someone from Mr. Hoare's law firm.
11     Q.  Okay.  Did you review the document
12 before you signed it?
13     A.  I did.
14     Q.  And was this document prepared based on
15 your conversation with Ms. Duffe?
16     A.  I would say yes.
17     Q.  Did you speak with anyone else?
18     A.  Inside the firm or --
19     Q.  At that office.
20     A.  She's pretty much the person that I
21 dealt with.
22     Q.  And did -- what was your understanding

Page 32

1  of why this document was prepared?
2      A.  I guess so that I can be like a witness
3  as to, you know, what transpired between the two
4  of them on that particular day.
5      Q.  Okay.  Do you remember after -- after
6  you saw the incident, do you remember talking
7  with Mr. Odeyale about it?
8      A.  No.
9      Q.  How did you come to be in touch with
10 Ms. Duffe?
11     A.  That's a good question.  I don't
12 recall.  I don't recall.
13     Q.  Do you recall whether you contacted
14 Mr. Odeyale after the incident?
15     A.  I'm not sure.  I really don't remember,
16 and I don't want to say I called him or he
17 called me, but apparently, you know, someone had
18 to call someone.  I mean, that's obvious, but --
19     Q.  Right.
20     A.  Hmm...
21     Q.  From your recollection of the incident
22 that you described, what -- did Mr. Odeyale

Page 33

1  notice your presence on the loading dock that
2  day?
3      A.  I'm not sure.
4      Q.  Would you have been close enough for
5  him to be able to see you?
6      A.  Again, I was a distance away, but that
7  doesn't necessarily mean that he did or did not
8  see me.
9      Q.  Um-hum.  When you -- looking at Exhibit
10 1, do you agree with everything that's written
11 in this document?
12     A.  Not anymore.
13     Q.  Okay.  And what don't you agree with?
14     A.  I don't agree with the statement, "I
15 heard Mr. Myers call Mr. Odeyale a nigger in a
16 loud voice."
17     Q.  Okay.  And why do you no longer agree
18 to that statement?
19     A.  Because I can't say 100 percent that
20 that's what he said during the loud exchange.
21     Q.  Okay.  This declaration identifies Phil
22 Myers by name.  Do you remember meeting

9 (Pages 30 to 33)

depo@ftrinc.net          For The Record, Inc.          301-870-8025

d495e6bd-df21-4950-a680-13f14d0d40d1

Selita Janey Shola Odeyale v. Aramark Management Services Limited Partnership   12/5/2006

Page 42

1  A. No, and that's why I said the 5th, 6th,
2  7th, because I -- again, I didn't want to
3  falsify anything.
4  Q. Okay. And when you met with Ms. Duffe,
5  was Mr. -- was anyone else present?
6  A. I think I spoke to her initially alone,
7  and I don't think that -- I think I went back
8  like -- there was another time where I went back
9  and we did this, but initially, I think I spoke
10  to her alone. I think it was a -- she and I
11  spoke with one another alone on both occasions,
12  I would say. Yeah, I don't recall.
13  Q. So, you recall two conversations with
14  her?
15  A. There may have been more than two
16  conversations. Are you referring to in person
17  or phone-wise or -- I mean, I have had a few
18  phone conversations with her, and I've met with
19  her a few times.
20  Q. Okay.
21  A. I think that's fair to say.
22  Q. Do you remember the first time you

Page 43

1  spoke with her?
2  A. I'm going to say it was shortly after
3  the incident occurred.
4  Q. Okay. And this is -- this says --
5  Exhibit 1 says, "Executed on October 18th,
6  2004."
7      Do you recall whether that's the date
8  you signed this?
9  A. I'm thinking it must have been, because
10  I remember speaking to them on whatever day this
11  was done, and then the young lady left out, and
12  she typed it up, and she brought it back, asked
13  me to read over it, and then I signed off on it.
14  So, I would say yes.
15  Q. Okay. So, had you -- before the
16  meeting where she prepared this, had you spoken
17  to her previous to that?
18  A. This was someone new. I don't recall
19  her name.
20  Q. Okay.
21  A. But it wasn't Ms. Duffe.
22  Q. Okay.

Page 44

1  A. Yeah.
2  Q. Was it someone from the same office as
3  Ms. Duffe, though?
4  A. Yes.
5  Q. Okay. And so Ms. Duffe did not prepare
6  this; someone else did. Is that what you're
7  saying?
8  A. Yes.
9  Q. Okay. Did -- when she prepared this,
10  whoever it was, did you make any changes to it,
11  to what she had prepared?
12  A. No, because at that time, I was certain
13  that that's what transpired.
14  Q. Um-hum.
15  A. But again, afterwards, it started
16  bothering me, and -- after I spoke to my friend,
17  and he was telling me, he was like, listen, you
18  know, you don't want to perjure yourself. Are
19  you 100 percent sure? You know, you have got to
20  think about this is a person's reputation and
21  this, that and the other, and I was like, wow,
22  you know, you're absolutely right. I said, that

Page 45

1  was the loading dock area, it is an echoey area,
2  and I cannot say 100 percent. What should I do?
3  I have already signed off on a paper saying
4  that, you know, I did actually hear it, but if I
5  can't say 100 percent that he did call him a
6  nigger, then I don't want to be on paper or
7  otherwise as saying that that gentleman called
8  him a nigger.
9  Q. So, is it fair to say that you no
10  longer agree with this declaration?
11  A. Absolutely.
12      MR. HOARE: Objection.
13      BY MS. EMIG:
14  Q. Have you spoken with anyone from
15  Ms. Duffe or Mr. Hoare's office since the time
16  you signed this declaration?
17  A. I spoke to someone during the summer
18  months, and I think it may have been Ms. Duffe.
19  Q. And was that the summer of 2006?
20  A. Um-hum.
21  Q. Okay. And what was discussed?
22  A. I believe she called in reference to

12 (Pages 42 to 45)

Selita Janey Shola Odeyale v. Aramark Management Services Limited Partnership    12/5/2006

Page 50

1   Q. Okay. In any event, you came to see
2  Ms. Duffe.
3   A. Correct.
4   Q. And you don't know how that happened
5  exactly.
6   A. Again, he -- either he or I made some
7  type of contact with one another. That's what
8  I'm assuming, because otherwise, how would I
9  know --
10  Q. Right.
11  A. -- who was representing him?
12  Q. And Ms. Duffe -- is it your belief that
13 Ms. Duffe contacted you to come in and talk to
14 her?
15  A. I don't think that's a fair thing to
16 say, because I don't recall.
17  Q. Okay.
18  A. I don't -- yeah.
19  Q. It may be that you contacted her to
20 come in and talk to her?
21  A. It could have very well happened that
22 way. I don't -- yeah.

Page 51

1   Q. All right, but you went in and talked
2  to her anyway, whatever -- however it
3  happened --
4   A. Exactly.
5   Q. -- you ended up talking to her in a
6  conference room?
7   A. Correct.
8   Q. And you were talking to her in a
9  conference room about what happened between
10 Mr. Odeyale and the tall thin bald-headed guy?
11  A. Right.
12  Q. Okay. You went in there to tell her
13 what you knew about that incident. Is that a
14 fair statement?
15  A. I think so, yes.
16  Q. Okay. Now, the statement, Exhibit 1,
17 suggests that, "I declare under penalty of
18 perjury that the foregoing is true and correct."
19  A. Um-hum.
20  Q. Now, what was your understanding of
21 that statement? You understand what perjury is?
22  A. I do.

Page 52

1   Q. Okay.
2   A. Making false accusations.
3   Q. Right, and I'm not suggesting that you
4  don't understand it.
5   A. Right.
6   Q. I'm just trying to confirm it for me.
7   A. Okay.
8   Q. Okay? You, in fact, understood that
9  you -- you intended to and you were expected to
10 and you were telling the truth.
11  A. At that time.
12  Q. Right, okay. In fact, it says that the
13 foregoing is true and correct, correct?
14  A. That's what it says.
15  Q. That's what it says. And you read that
16 before you signed it?
17  A. I did.
18  Q. And you understood when you signed this
19 document, as best you could, that what you were
20 signing was true and correct.
21  A. Yes.
22  Q. Okay. Now, what do you mean when you

Page 53

1  said that the sexual harassment was rampant in
2  that place?
3   A. What I mean by that is that it's been
4  an ongoing problem since I started working
5  there, and again, I've been there 12 years.
6   Q. Is it a problem for other women as
7  well?
8   A. Yes, it is.
9   Q. Did you mean that it's a problem for
10 you and other women?
11  A. Yes, I did.
12  Q. Not just a problem for you, but --
13  A. Correct.
14  Q. Okay. Now -- all right. Who was the
15 friend that you had the conversation with about
16 the confrontation between Mr. Odeyale and the
17 tall thin bald-headed guy?
18  A. My boyfriend.
19  Q. All right. Is he in law enforcement or
20 security?
21  A. No.
22  Q. Okay. Do you know when that occurred?

14 (Pages 50 to 53)

depo@ftrinc.net    For The Record, Inc.    301-870-8025

d495e6bd-df21-4950-a680-13f14d0d40d1

Selita Janey Shola Odeyale v. Aramark Management Services Limited Partnership   12/5/2006

Page 58

```
 1    A.  All righty, okay.
 2              EXAMINATION
 3    BY MS. EMIG:
 4    Q.  If can I just ask a couple more
 5  questions --
 6    A.  Sure -- no, I have one.  If I wanted to
 7  withdraw this, is it too late or --
 8    Q.  No.
 9    A.  That's what I'd like to do.
10    Q.  So, are you saying that this statement
11  is not true and correct?
12         MR. HOARE:  Objection.
13         THE WITNESS:  Yes.
14    BY MS. EMIG:
15    Q.  And just to be clear, the statement
16  refers to Phil Myers, but you witnessed an
17  exchange between Mr. Odeyale and a tall thin
18  bald man.  Did you at some point confirm that
19  that same person was Mr. Myers or --
20    A.  Yeah.
21    Q.  Were you -- at the time of this
22  statement -- is it true that you -- excuse me.
```

Page 59

```
 1  Is the statement still true to the
 2  extent that it states that you heard an exchange
 3  between Shola Odeyale and Phil Myers?
 4    A.  Well, what I had did was I asked
 5  someone, just like -- I was having a general
 6  conversation, I never mentioned why I was asking
 7  them, and I was like, hey, what's that guy's
 8  name?  I said he's kind of new around here, I
 9  haven't seen him much.  And they said, well, his
10  name is Phil Myers, and he's the one I saw
11  having the exchange with Shola, so that's how I
12  found out what his name was, because again, he
13  was kind of like an unfamiliar face.  He was,
14  like, new.
15         I don't know if he was there or he came
16  in periodically, but he was not around on a
17  consistent basis.  He had just started I would
18  say working there, if that's what he was doing,
19  or coming over as a project manager.  I don't
20  know what his job title was.  I don't know.
21    Q.  Okay.
22         Thank you, I have no further questions.
```

Page 60

```
 1  Thank you very much for coming in.
 2    A.  Thank you.
 3         All right, do you guys want this back?
 4    Q.  Yes, thank you.
 5         (Discussion off the record.)
 6         MR. HOARE:  For the record, Ms. Janey
 7  has decided to review the transcript.
 8         (Reading and signature reserved.)
 9         (Whereupon, at 11:56 a.m. the
10  deposition was concluded.)
```

Page 61

```
 1  DISTRICT OF COLUMBIA, to wit:
 2
 3     I, Susanne Bergling, the officer before
    whom the foregoing deposition was taken, do
    hereby certify that the within-named witness
 4  personally appeared before me at the time and
    place herein set out, and after having been duly
 5  sworn by me, according to law, was examined by
    counsel.
 6
     I further certify that the examination
 7  was recorded stenographically by me and this
    transcript is a true record of the proceedings.
 8
     I further certify that I am not of
 9  counsel to any of the parties, nor an employee
    of counsel, nor related to any of the parties,
10  nor in any way interested in the outcome of this
    action.
11
     As witness my hand and notarial seal
12  this 18th day of December, 2006.
13
14
15
                _____
16                Susanne Bergling
                  Notary Public
17
18
19  MY COMMISSION EXPIRES:
20      3/14/08
21
22
```

16 (Pages 58 to 61)